EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Marta Nieves Cruz en representación de Angel Luis Hernández Nieves<br><br>    Apelados<br><br>    v.<br><br>Universidad de Puerto Rico; Asociación de Garantía de Seguros Misceláneos<br>    Apelantes | Certiorari<br><br>2000 TSPR 78 |
|---|---|

Número del Caso: CC-1998-0876
              AC-1998-0047 Consolidados

Fecha: 31/05/2000

Tribunal de Circuito de Apelaciones: Circuito Regional VII

Juez Ponente: Hon. Zaida Hernández Torres

Abogados de la UPR:

                Lcdo. Roberto Nater
                Lcdo. Rubén T. Nigaglioni

Abogada de la Asociación de Garantía de Seguros:

                Lcda. Gladys E. Guemárez

Abogados de la Marta Nieves:

                Bufete David Efrón
                Lcdo. José A. Cuevas Segarra
                Lcdo. Alberto Pérez Hernández


Abogada del Departamento de Justicia:

                Lcda. Lucienne Laureano Rosa

Materia: Daños y Perjuicios


        Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Marta Nieves Cruz en Represen-
tación de Angel Luis Hernández
Nieves

    Demandantes-Apelados

         vs.             CC-1998-876     Certiorari
                         Cons. AC-1998-47

Universidad de Puerto Rico;
Asociación de Garantía de
Seguros Misceláneos

    Demandados-Apelantes

Opinión del Tribunal emitida por el Juez Asociado señor FUSTER BERLINGERI.

San Juan, Puerto Rico, a 31 de mayo de 2000.

Nos toca resolver inter alia si la Ley Núm. 98 de 24 de agosto de 1994, que incluyó a la Universidad de Puerto Rico dentro de los límites de responsabilidad del Estado, tiene aplicación retroactiva.

I

Angel Hernández Nieves nació el 24 de diciembre de 1983 en el Hospital de Area de Carolina, que era entonces propiedad del Estado Libre Asociado de Puerto Rico y se utilizaba como centro de enseñanza por el Recinto de Ciencias Médicas de la Universidad de Puerto Rico.

Los obstetras que atendieron a la señora Nieves, madre de Angel, no habían tenido contacto previo con ella, por lo que desconocían su historial médico de embarazo.

Al llegar al hospital referido, la señora Nieves presentaba los síntomas de un parto pretérmino que requería el cuidado de especialistas de la mayor experiencia posible, pero fue atendida por un interno en su primer año de entrenamiento. Cuando la paciente llegó al Hospital fue enviada a la sala de partos y no se tomó ninguna medida para tratar de posponer el alumbramiento.

Durante el transcurso del parto, a la señora Nieves le fueron suministradas dos dosis de demerol y una dosis de una droga llamada vistaril, que duplicó el efecto del demerol. Dicha combinación de drogas ocasionó la depresión del sistema respiratorio del prematuro infante, causándole dificultad para respirar durante el alumbramiento. También sufrió disminuciones en los latidos fetales. El infante nació muy deprimido[1], su color no era saludable y sus signos vitales no eran normales. Tenía rasgos evidentes de daños causados por hipoxia (falta de oxígeno en la sangre). Por esta condición, el infante requería ser entubado inmediatamente, pero los encargados de hacerlo tardaron 7 u 8 minutos antes de realizar dicha labor, mientras el bebé estaba sin respirar. En la actualidad, el menor Hernández

---

[1] El Tribunal de Instancia en sus determinaciones de hechos, indicó que "deprimido quiere decir que sus centros vitales no estaban funcionando correctamente".

Nieves sufre severas lesiones permanentes e incapacitantes, incluyendo incapacidad física y retardación mental.

El 30 de diciembre de 1993, la señora Nieves presentó una demanda en el entonces Tribunal Superior, Sala de Carolina, en representación de su hijo, contra la Universidad de Puerto Rico y otros codemandados. Después de los trámites procesales de rigor, el Tribunal de Primera Instancia dictó una sentencia el 15 de agosto de 1997, y declaró con lugar la demanda interpuesta contra la Universidad de Puerto Rico y la Asociación de Garantía de Seguros Misceláneos (en representación del interés de la aseguradora de la Universidad, la Corporación Insular de Seguros). Ordenó el pago de $750,000 a favor del menor demandante "por concepto de daños físicos, pasados, presentes y futuros, su incapacidad permanente...."; $325,000 "por concepto de menoscabo de potencial de generar ingresos"; $2,900,000 "por todos los gastos futuros de cuidado, transportación, dietas, lucro cesante y demás gastos misceláneos especiales...". Además, se le impuso a la Universidad de Puerto Rico la suma de $10,000 en concepto de honorarios de abogado. La responsabilidad de la Asociación de Garantía de Seguros Misceláneos se limitó a la suma de $150,000.

Tanto la Universidad de Puerto Rico, como la Asociación de Garantía de Seguros Misceláneos presentaron sendos recursos de apelación ante el Tribunal de Circuito de Apelaciones. Ese foro consolidó los recursos referidos y

después de haber celebrado una vista oral el 25 de agosto de 1998, dictó una sentencia mediante la cual modificó la del Tribunal de Primera Instancia a los efectos de restar la suma de $325,000 de la partida de $2,900,000.

Tanto la Asociación de Garantía de Seguros (Asociación) como la Universidad de Puerto Rico (U.P.R.) comparecieron ante nos mediante recursos separados. La Asociación planteó las siguientes cuestiones:

### Primer error:

Erró el Tribunal de Circuito de Apelaciones al confirmar la sentencia del tribunal de instancia a pesar de que no se estableció la relación de los médicos con la universidad por falta de prueba al respecto.

### Segundo error:

Erró el Tribunal de Circuito de Apelaciones al confirmar la sentencia del tribunal de instancia en ausencia de prueba de que la negligencia de la universidad fue la causa adecuada y eficiente de sus daños.

### Tercer error:

Erró el Tribunal de Circuito de Apelaciones al aplicar la doctrina de abstención apelativa cuando debió examinar la prueba pericial y adoptar su propio criterio en la apreciación de la misma.

### Cuarto error:

Erró el Tribunal de Circuito de Apelaciones al confirmar la determinación del tribunal de instancia en torno a la no aplicación de la ley 98 del 24 de agosto de 1994 a este caso y obviar la clara disposición del legislador sobre el particular.

### Quinto error:

Erró el Tribunal de Circuito de Apelaciones al confirmar las cuantías de daños concedidas por el tribunal de instancia apartándose de las normas establecidas por el Tribunal Supremo para la evaluación de las mismas.

### Sexto error:

Erró el Tribunal de Circuito de Apelaciones al confirmar la imposición del tribunal de instancia del pago de honorarios de abogado ignorando los criterios establecidos sobre el particular por el Tribunal Supremo.

Por su parte, la Universidad de Puerto Rico planteó que el Tribunal de Circuito de Apelaciones había cometido los siguientes errores:

"A. Erró al no extender a la Universidad los límites de responsabilidad que se le aplican al Estado Libre Asociado de Puerto Rico.

B. Erró al aplicar y extender la doctrina de la Fuente Colateral.

C. Erró al conceder indirectamente al demandante lucro cesante.

D. Erró al analizar las otras partidas de daños concedidas."

El 15 de enero de 1999, expedimos ambos recursos y ordenamos su consolidación. El 13 de mayo de 1999, la U.P.R. presentó su alegato. El 14 de mayo, la Asociación solicitó que acogiéramos su escrito de apelación como su alegato, a lo cual accedimos. El 8 de junio de 1999, la parte recurrida presentó su alegato. Con el beneficio de las comparecencias referidas, pasamos a resolver.

II

## ¿Tiene aplicación retroactiva la Ley 98 de 24 de agosto de 1994?

La Ley 98 referida enmendó el Art. 41.050 del Código de Seguros, 26 L.P.R.A. sec. 4105, para que éste, en lo pertinente, dispusiese lo siguiente:

> "En toda acción civil en que se le reclamen daños y perjuicios a la Universidad de Puerto Rico, en todo caso en que recaiga sentencia por actos constitutivos de impericia médica hospitalaria que cometan los empleados... del Recinto de Ciencias Médicas..., o cuando recaiga sentencia por actos constitutivos de culpa o negligencia directamente relacionada con la operación por la Universidad de Puerto Rico de una institución de cuidado de la salud, se sujetará a la Universidad... a los límites de responsabilidad... que las secs. 3077 et seq. del Título 32 impone para exigirle responsabilidad al Estado Libre Asociado de Puerto Rico en circunstancias similares."

En el caso de autos, tanto el foro de instancia como el panel del Tribunal de Circuito de Apelaciones determinaron que la disposición referida no era de aplicación aquí en vista de que ésta se había aprobado y entró en vigor en 1994 mientras que la causa de acción en cuestión había surgido en 1983 y la presentación de la demanda correspondiente en 1993, ambos con anterioridad a la vigencia de dicha disposición. Ambos peticionarios impugnaron estas determinaciones judiciales, y alegaron ante nos que la intención legislativa fue que se aplicase dicha disposición de modo retroactivo. En otro caso que no está ante nuestra

consideración aquí, otro panel del foro apelativo resolvió que la disposición referida tenía efecto retroactivo.[2]

El Artículo 3 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3, dispone que:

> "Las leyes no tendrán efecto retroactivo, **si no dispusieren expresamente lo contrario**." (Enfasis suplido).

El principio de **irretroactividad** que recoge el Artículo 3 referido es uno de los postulados jurídicos fundamentales, que se remonta al derecho romano y que ha sido acogido en todos los códigos de los países de tradición civilista. F. Puig Peña, <u>Compendio De Derecho Civil Español</u>, Madrid 1976, Tomo I, págs. 124-130. De honda prosapia en la teoría del derecho, una de sus justificaciones radica en la ley natural, que repudia que una norma pueda tener efecto en un momento en que no existía. Id. O, como ha señalado Hans Walter Scheerbarth, "la ley que pretenda ser aplicable a un caso que haya ocurrido antes que la ley haya entrado en vigor es un fantasma del Estado policial", citado por Suárez Collia en <u>El Principio de Irretroactividad de las Normas Jurídicas</u>, Madrid, 1994, págs. 48-49. Conforme a este principio, la retroactividad de una norma se justifica únicamente en casos aislados, "por determinadas y supremas circunstancias", que hayan sido establecidas concretamente por el legislador. Puig Peña, <u>supra</u>.

---

[2]  <u>Montañez López v. U.P.R.</u>, sentencia de 9 de noviembre de 1998, KLAN 98-913.

En la doctrina civilista se ha justificado que el legislador le dé efecto retroactivo a determinadas leyes cuando ello es necesario para la transformación y progreso de situaciones pasadas que deben eliminarse por razones de justicia o de interés general. M. Albaladejo, Comentarios al Código Civil, Madrid, 1978, Tomo I, págs. 74-76. Se trata principalmente de normas de **derecho público**, referentes a males sociales que deben remediarse, por lo que se estima que el legislador no debe estar atado a una norma inflexible de irretroactividad. En cuanto a leyes referentes al **derecho privado**, sin embargo, el criterio de la doctrina es que éstas nunca deben ser retroactivas. Puig Peña, supra, pág. 129.

Es por todo lo anterior, que reiteradamente hemos resuelto que la intención de la Asamblea Legislativa de darle efecto retroactivo a una ley, **por ser un acto excepcional**, "debe aparecer expresamente o surgir claramente del estatuto", Vázquez v. Morales, 114 D.P.R. 822, 831 (1983); Guardiola Pérez v. Morán, 114 D.P.R. 477 (1983); Atiles, Admor. v. Comisión Industrial, 77 D.P.R. 511, 512 (1954); Echeandía v. Alvarado, 65 D.P.R. 230, 235 (1945); Baiz v. Comisión Hípica, 63 D.P.R. 483, 487 (1944), López v. South P.R. Sugar Co., 62 D.P.R. 238, 242 (1943); Hernández Usera Ex parte, 52 D.P.R. 120, 134 (1937). La retroactividad debe haber sido expresada afirmativamente en el propio texto del estatuto. Monllor & Boscio, Sucrs. v. Sánchez Bonet, Tes., 61 D.P.R. 67, 73 (1942). Si la nueva

disposición legislativa no expresa de modo claro e inequívoco que tendrá efecto retroactivo, entonces la ley aplicable al asunto es **la que estaba vigente cuando ocurrieron los hechos que dan lugar a la causa de acción**. Véase, Arce Oliveras v. E.L.A., 122 D.P.R. 877, 879 (1988); Kobler v. Escambron Development Corp., 85 D.P.R. 743, 744 (1962); y, Atiles, Admor. v. Comisión Industrial, supra, a la pág. 512. En las escasas ocasiones en que nos hemos apartado de estas normas imperiosas, ello ha sido porque era obvio y patente el propósito legislativo, en casos en los cuales la aplicación retroactiva de la legislación en cuestión era necesaria para corregir un grave mal social o para hacerle justicia a unos peticionarios. Véase, Vélez v. Srio. de Justicia, 115 D.P.R. 533 (1984); Díaz v. Srio. Hacienda, 114 D.P.R. 865 (1983) y Warner Lambert Co. v. Tribunal Superior, 101 D.P.R. 378 (1973). En ninguno de estos estaban involucradas normas referentes al derecho privado.

En el caso de autos, el estatuto en cuestión no dispone de modo alguno que la nueva disposición que limita la responsabilidad económica de la U.P.R. en casos de impericia médica ha de tener efecto retroactivo. Ciertamente no lo dispone de manera expresa, ni ello surge claramente de algún otro modo. Quizás por lo anterior —por la ausencia de una expresión clara sobre el particular en el propio estatuto— los demandados no levantaron el asunto de la supuesta retroactividad de la disposición referida en su contestación

a la demanda, que ocurrió el 15 de febrero de 1995; ni en el informe de conferencia con antelación al juicio del 30 de diciembre de 1996, aunque a esta fecha habían transcurrido ya más de 28 meses de haberse aprobado dicha legislación.[3]

Los peticionarios han aludido al historial legislativo de la Ley 98 en cuestión para señalar que en las vistas públicas en torno al proyecto del Senado correspondiente, el Presidente de la U.P.R. testificó a favor de que se le diese efecto retroactivo a dicha legislación. Han indicado que ese funcionario hizo hincapié en la necesidad de hacer aplicable la proyectada Ley 98 a las numerosas reclamaciones judiciales que ya se habían presentado contra la U.P.R. Resulta, sin embargo, que la alusión al historial legislativo demuestra todo lo contrario a lo alegado. **Sólo refleja que aunque el legislador tuvo ante sí el asunto de la retroactividad, no dispuso tal efecto de modo claro alguno**. Si existía una intención legislativa de retroactividad definitiva, en vista de planteamientos como el del Presidente de la U.P.R. referido, lo lógico hubiese sido que se incluyera en la Ley 98 una sencilla oración

---

[3] La parte recurrida ha planteado que como los peticionarios nunca enmendaron sus contestaciones a la demanda para levantar, como defensa afirmativa, el asunto de la retroactividad, tal defensa debe entenderse como renunciada. Se amparan, inter alia, en lo que resolvimos en, Insurance Co. of P.R. v. Tribunal Superior, 100 D.P.R. 405 (1972) y en Insurance Co. of P.R. v. Ruiz, 96 D.P.R. 175 (1968). En vista de lo que resolvemos en esta opinión sobre el asunto de retroactividad, no es necesario resolver este planteamiento.

expresando tal intención. Como se ha hecho antes, se hubiese

incluido una disposición que leyese así:

> "Esta ley comenzará a regir inmediatamente después de su aprobación, y sus disposiciones aplicarán a causas de acción cubiertas por sus disposiciones que estén pendientes ante el Tribunal de Primera Instancia de Puerto Rico a la fecha de su aprobación." Véase, Rodríguez Ríos v. E.L.A., 116 D.P.R. 102, 104 (1985).

Pero dicha ley no dice nada sobre el particular. Se limita

ésta sólo a ordenar su vigencia inmediata, sin expresión

alguna que indique textualmente o de algún otro modo claro

que la nueva disposición sería de aplicación retroactiva,

como sería necesario para que su drástica disposición

tuviese efecto también con respecto a pleitos pendientes al

aprobarse dicha ley.

Es evidente, además, que tampoco están presentes aquí

las circunstancias excepcionales de Vélez v. Srio. de

Justicia, supra, Warner Lambert Co. v. Tribunal Superior,

supra, o Díaz v. Srio. de Hacienda, supra. Tomando esto en

cuenta, en vista de que la Ley 98 referida no ordena su

aplicación retroactiva de modo expreso, ni ello surge de

modo claro alguno de dicho estatuto, resolvemos que la

disposición en cuestión sólo aplica **prospectivamente** a casos

cuyas causas de acción hayan surgido estando ésta vigente

ya.

III

## La Apreciación de la Prueba

Pautado ya el principal asunto normativo del caso de

autos, procede que pasemos a examinar las otras cuestiones

planteadas ante nos por los peticionarios en el caso de autos. Varias de ellas aluden a supuestos errores cometidos por el foro de instancia en su apreciación de la prueba. Veamos.

**A.** La Asociación alegó, en primer lugar, que no se había establecido por los demandantes-recurridos que la U.P.R. respondía por las actuaciones de los médicos que intervinieron en el parto que aquí nos concierne, según lo requiere el Artículo 1803 del Código Civil, 31 L.P.R.A. sec. 5142.

Esta alegación es inmeritoria. Para comenzar, debe señalarse que la propia U.P.R. en ningún momento ha negado que fue personal médico suyo el que intervino en el parto de la señora Nieves. Es altamente significativo que la primordial parte demandada en un pleito tan controvertido como el de autos no haya planteado que las actuaciones de los médicos referidos no era responsabilidad suya. Ello permite la inferencia de que dichos médicos eran parte de su personal. Más aun, en la contestación a la demanda del 15 de febrero de 1995, la propia Asociación de Garantía de Seguros Misceláneos admitió en su totalidad el primer párrafo de la demanda contra la U.P.R. y el E.L.A., en el cual se alegaba que la señora Nieves había dado a luz el 24 de diciembre de 1993 en el Hospital de Area de Carolina, que era propiedad y estaba siendo operado por dichos demandados. Admitió, pues, la relación de la U.P.R. con el parto referido.

Por otro lado, surge de los documentos que obran en autos que el foro de instancia consideró, dilucidó mediante vista, y concedió una solicitud de sentencia sumaria desestimando la demanda referida en cuanto al E.L.A. Ello ocurrió porque el E.L.A. pudo demostrar que los médicos cuya alegada negligencia había causado los daños de la parte demandante **no eran empleados suyos y sí lo eran de la U.P.R.** Tanto la Asociación como la U.P.R. fueron parte en este procedimiento y ninguna de ellas impugnó la solicitud del E.L.A. referida ni el dictamen de instancia aludido. Quedó establecido así judicialmente la vinculación de la U.P.R. con los médicos en cuestión.

Finalmente, obra en autos el contrato suscrito por la U.P.R. con el Departamento de Salud y el Hospital de Area de Carolina en virtud del cual el Hospital obtuvo los servicios del Recinto de Ciencias Médicas de la U.P.R. Conforme a dicho contrato, el Recinto referido de la U.P.R. habría de proveer **todos** los servicios profesionales a **todos** los pacientes médico-indigentes del Hospital, como lo era la señora Nieves.

A la luz de todo lo anterior, es claro que los médicos que atendieron a la señora Nieves en el caso de autos constituían personal del Recinto referido de la U.P.R., por lo que ésta respondía civilmente por sus actos. No se cometió, pues, el error alegado.

**B.**    Mediante su segundo señalamiento de error, la Asociación de Garantía de Seguros Misceláneos planteó en el caso de autos que no se había probado que la negligencia de la Universidad fuese la causa adecuada de los daños sufridos por el demandante. En su tercer señalamiento alegó que el Tribunal de Circuito de Apelaciones no había ejercido su función revisora al no adoptar su propio criterio en la apreciación de la prueba pericial.

Como ambos señalamientos están íntimamente relacionados, los discutiremos de modo conjunto. Un examen del testimonio de los peritos presentados por la parte demandante, según surge de la transcripción de la prueba que obra en autos, demuestra claramente que la negligencia de los doctores que atendieron el parto fue la causa de los daños que sufrió el menor. El Dr. Bernard Nathanson, quien fue cualificado como perito en obstetricia-ginecología sin objeción de la parte demandada, identificó en su testimonio todas las desviaciones incurridas por los médicos en cuestión del estándar aceptado y reconocido por la profesión médica en el tratamiento del parto de la señora Nieves. El testimonio del doctor Nathanson, que fue corroborado por el testimonio del Dr. Allan Hausknecht, un neurólogo, se refiere particularmente a la falta de la debida atención médica recibida por la madre del menor durante el parto, y al cuido inadecuado provisto al recién nacido en la sala de parto.

Luego de enumerar y explicar todas y cada una de las desviaciones de las normas de cuidado en este caso, el doctor Nathanson concluyó con un grado razonable de certeza médica que hubo negligencia médica en el manejo del parto, en el alumbramiento y en la resucitación del recién nacido. Destacó que durante el transcurso del parto se le suministraron a la madre dos dosis de la droga narcótica demerol, suplementada con una dosis de la droga vistaril; y que la combinación de demerol-vistaril tuvo el efecto funcional de doblar el efecto del demerol. Señaló que tanto demerol afectó adversamente el sistema respiratorio del infante. El perito opinó que a la señora Nieves no se le debió haber suministrado demerol, debido a su estado pretérmino de alto riesgo, y ciertamente nunca una dosis tan alta como la que se le suministró y, mucho menos, acompañada con el vistaril.

Con arreglo al testimonio pericial referido, el Tribunal de Primera Instancia concluyó que se había demostrado que hubo negligencia médica en el manejo del parto, del alumbramiento y de la resucitación inmediata del infante. Determinó, además, que si no hubiera mediado la negligencia aludida, el infante no hubiera nacido deprimido, no hubiese sufrido de 7 u 8 minutos de hipoxia después del alumbramiento, en adición al periodo de tiempo anterior al alumbramiento durante el cual los latidos fetales se habían desacelerado, lo cual indicaba también que hubo un periodo de tiempo significativo de hipoxia. El Tribunal de Primera

Instancia determinó, finalmente, que el testimonio del doctor Hausknecht no había sido contradicho. Este perito había concluido que existía una relación causal entre la incapacidad permanente total del menor demandante y los actos y omisiones negligentes de los médicos que atendieron el parto.

Es evidente de todo lo anterior, que el tribunal de instancia tenía fundamentos suficientes en la prueba presentada para hacer las determinaciones que hizo. No hemos de interferir con las apreciaciones de los hechos aludidas.

IV

**Las Cuantías**

Los peticionarios también impugnaron ante nos las cuantías concedidas al demandante por el foro de instancia. Hicieron planteamientos diversos sobre el particular, que debemos examinar. Veamos.

**A.** La Universidad de Puerto Rico planteó que una parte considerable de la condena de $2,900,000 consistía de gastos futuros de cuido, terapias, transportación, dietas y otros gastos misceláneos similares que el estado de Florida, a donde tuvo que ir a domiciliarse el demandante, le ha estado pagando a éste. Por dicha razón, la Universidad alegó que ha sido condenada a indemnizar unos gastos en los cuales el demandante podría no incurrir nunca.

En nuestra jurisdicción hemos adoptado ya la *doctrina de la fuente colateral*, conforme a la cual, **como regla general**, el causante de un daño está impedido de deducir del importe de la indemnización que se le ha impuesto, la compensación o beneficios que el perjudicado haya recibido de una tercera persona o entidad. Futurama Import Corp. v. Trans Caribben, 104 D.P.R. 609 (1976). La doctrina referida se fundamenta en el principio de que el que causa un daño por su negligencia no debe beneficiarse de lo que el perjudicado haya recibido por la liberalidad de otros ni de los servicios públicos que la comunidad extiende a los necesitados. H.M. Brau del Toro, Los Daños y Perjuicios Extracontractuales en Puerto Rico, Publicaciones J.T.S. 1980, pág. 449. Esta concepción tiene amplio apoyo en la doctrina civilista, que se fundamenta también en que la relación del tercero que concede beneficios al perjudicado es completamente distinta a la que tiene con éste el causante de sus daños. El que causa el daño está obligado a indemnizar mientras que lo concedido por el tercero está abonado por otro título. Santos Briz, La Responsabilidad Civil, Madrid, 1993, págs. 275-276; Puig Brutau, Fundamentos de Derecho Civil, Barcelona, 1983, Tomo II, Vol. III, pág. 198; Mazeaud, Derecho Civil, 1960, Parte II, págs. 62-63. Orgaz, en su clásica monografía, El Daño Resarcible, Córdoba, 1980, a la pág. 191, lo ha señalado de la manera siguiente:

> "Algunas veces, con motivo de un acto ilícito, el damnificado es socorrido con donaciones de

personas o instituciones benéficas o con el producto de suscripciones públicas. <u>Existe unanimidad de pareceres en el sentido de que el autor del acto ilícito no puede pretender que estos beneficios se deduzcan del importe que debe satisfacer en concepto de indemnización; se trata de beneficios enteramente fortuitos que ninguna conexión propiamente causal tiene con el acto del responsable</u>. (Enfasis suplido).

En Futurama Import Corp. v. Trans Caribbean, supra, sin embargo, hicimos claro que la doctrina de la fuente colateral no debía aplicarse mecánicamente. Preocupados por el problema de la llamada "doble compensación" o la acumulación de las indemnizaciones, señalamos que en cada caso debe examinarse el origen y propósito del beneficio colateral en cuestión, para decidir entonces si éste se deducía o no de la indemnización que debía pagar el causante del daño.

En el caso de autos, el beneficio colateral que ha provisto el estado de Florida al demandante no constituye una doble compensación, como quizás podría ocurrir si el demandante hubiese recibido algún pago como asegurado mediante una póliza de seguro propia expedida para indemnizar daños afines. Los beneficios que ha recibido el demandante surgen de una política social estatal que persigue ayudar a cualquier incapacitado que resida en el Estado, por su mera condición como tal, que nada tiene que ver con la reparación de daños sufridos por una impericia médica. Se trata de beneficios **de duración incierta**, que dependen de los fondos que el Estado tenga disponible para tales fines, de la voluntad política de continuar

otorgándolos que exista en ese Estado, y de que el demandante continúe residiendo allí. Resolver como pretende la peticionaria significaría dejarle que se beneficie de lo que la comunidad de Florida ha dispuesto, no para ella sino para sus residentes incapacitados, y así verse librada de gratis de una obligación por circunstancias que le son totalmente extrañas. Significaría, además, condenar al perjudicado a ser inexorablemente el recipiente de una beneficencia pública fuera de su país, sin poder socorrerse él mismo en instituciones privadas de su preferencia. No tiene razón, pues, la peticionaria. El error no fue cometido.

**B.** La U.P.R. planteó también que el foro apelativo no corrigió de modo adecuado el error que supuestamente cometió el foro de instancia al concederle a la vez al demandante una indemnización por "lucro cesante" y otra por "menoscabo del potencial de generar ingresos". Según la peticionaria, cuando el Tribunal de Circuito de Apelaciones ordenó que se restase $325,000 de los $2,900,000 que el tribunal de instancia concedió "por todos los gastos futuros de cuidado, transportación, dietas, lucro cesante, y demás gastos misceláneos especiales", dicho foro procuraba corregir el problema de **duplicidad de partidas** que supuestamente surgía del hecho de que el tribunal de instancia también le había concedido al demandante una partida separada de $325,000 "por concepto de menoscabo de potencial de generar

ingresos". Adujo la U.P.R. que tal dictamen del foro apelativo lo que hacía en efecto era eliminar la partida correspondiente al menoscabo referido, mientras dejaba vigente la partida errónea e indeterminada de lucro cesante, que usualmente era mayor que la que se concedía por el menoscabo aludido.

En su sentencia, el foro apelativo indicó que no entendía por qué el foro de instancia había incluido el concepto de "lucro cesante" en la partida referida. Señaló que la propia parte demandante no había reclamado lucro cesante. Con arreglo a Ruíz Santiago v. E.L.A., 116 D.P.R. 306 (1985), determinó, además, que tal partida era jurídicamente improcedente en un caso como el de autos. El tribunal apelativo entonces aludió a la supuesta dificultad de corregir el alegado error del foro de instancia debido a que éste no le había otorgado un valor determinado al lucro cesante, por lo que carecía de "unos parámetros específicos" sobre el particular que le permitiesen corregir el supuesto error. Por lo anterior, el Tribunal de Circuito de Apelaciones dispuso, **sin más**, que debía reducirse de los $2,900,000 la cantidad de $325,000 que fueron otorgados por menoscabo del potencial de generar ingresos.

No cabe dudas de que en el caso de autos no podía concederse al demandante una partida por lucro cesante debido a que éste nunca había recibido ingresos derivados de un trabajo. Ausente un historial previo de actividad retribuida, era improcedente una indemnización por concepto

de lucro cesante. Ruiz Santiago v. E.L.A., supra. El foro apelativo determinó correctamente este aspecto de la cuestión aludida. Si el foro de instancia en efecto hubiese concedido alguna indemnización por concepto de lucro cesante, ésta debía eliminarse por ser improcedente.

Pero resulta que el foro de instancia realmente no otorgó tal indemnización. Si se examina cuidadosamente el texto de la sentencia a quo, surge con claridad de ésta que el tribunal no consideró para nada el asunto del lucro cesante; y que **la única mención** que aparece de este concepto en la página final de la sentencia, de sólo dos palabras, debe haber sido un error tipográfico. El tribunal de instancia sí dedicó dos páginas de la sentencia a discutir lo relativo al menoscabo del potencial de generar ingresos, y se apoyó para ello en nuestra medular decisión en Ruiz Santiago v. E.L.A., supra. Luego examinó lo relativo a los gastos de tratamiento médico y cuido especial que tendría el menor por estar incapacitado de modo permanente. Sobre el particular señaló lo siguiente:

> "La prueba también ha demostrado de forma incontrovertida que... el menor necesitará cuido especial constante y permanente durante su vida, habiéndose colocado en condiciones al Tribunal de evaluar estas partidas especiales mediante el estimado razonable no contradicho del Dr. Allan Hausknecht. El doctor Hausknecht testificó que el costo de cuido y tratamiento en estos casos es nacionalmente igual. Indicó que el costo promedio sería entre $50,000 a $60,000 al año hasta los 16 ó 17 años de edad; entre $70,000 y $75,000 al año entre los 17 y los 25 años y de $60,000 al año cuando esté institucionalizado por no tener a sus padres u otro familiar cercano que se ocupen de él. ...A la luz de lo expuesto, el Tribunal entiende razonable no

conceder indemnización por cuidos y tratamientos pasados no incurridos y **que éstos deben proceder a partir de la sentencia utilizando la suma menor anual de $50,000, proyectada hasta la edad de setenta años. Por lo que, a base de esto, el demandante tiene derecho por estos conceptos, a una suma global de DOS MILLONES NOVECIENTOS MIL DOLARES**". (Enfasis suplido).

De lo anterior, es evidente que la partida impugnada de $2,900,000 no incluía de modo alguno una indemnización por lucro cesante. Es evidente, además, que tanto la peticionaria como el foro apelativo se equivocaron al entender que en la referida partida de $2,900,000 se habían englobado de manera indeterminada la indemnización de varios daños distintos sin precisar el monto concreto de cada uno. Dicha partida, según hemos visto, se refería de modo expreso **únicamente** al pago de gastos futuros para tratamiento médico y cuido del menor incapacitado a base de $50,000 anuales hasta la edad de setenta (70) años.[4] Por ello, el error que sí cometió el foro apelativo fue el de ordenar la reducción de $325,000 de la partida referida. El tribunal consideró que con esa reducción se conjuraba el problema de duplicidad de partidas, pero como dicho problema realmente no existía, la reducción dispuesta fue improcedente.[5] Erró el foro apelativo al ordenarla.

---

[4] El tribunal de instancia sí cometió un error de cálculo. Al momento de dictarse la sentencia, el menor demandante tenía 13 años, por lo que le quedaban 57 años para llegar a la edad de 70. Por ello, a base de $50,000 por año, la cantidad total debió ser **$2,850,000** y no $2,900,000 según dispuso dicho foro.

[5] Fue improcedente, además, por otra razón. Si hubiese sido correcta la apreciación del foro apelativo de que la

**C.** Finalmente, las peticionarias impugnaron por excesivas las varias cuantías concedidas al demandante por el foro de instancia y ratificadas por el foro apelativo. Señalaron ambas que las partidas otorgadas eran muy elevadas y más altas que las que se han concedido judicialmente en casos similares.

En innumerables ocasiones hemos señalado que la gestión judicial de estimar y valorar los daños en casos como el de autos es difícil y angustiosa, debido a que no existe un sistema de certera computación que permita llegar a un resultado exacto en relación con el cual todas las partes queden satisfechas y complacidas. Blas v. Hospital Guadalupe, opinión del Tribunal del 30 de junio de 1998, 146 D.P.R. ___, 98 JTS 101; Rodríguez Cancel v. A.E.E., 116 D.P.R. 443 (1985); Urrutia v. A.A.A., 103 D.P.R. 643 (1975).

También es un principio reiterado que este Tribunal no intervendrá con la decisión sobre estimación de daños que

---

indemnización supuestamente otorgada por el foro de instancia por lucro cesante era indeterminada, por estar englobada junto con otras, entonces frente a tal circunstancia, lo que el tribunal apelativo debió hacer era devolver el caso al tribunal de instancia para que éste desglosara las cantidades particulares que correspondían a los varios daños supuestamente incluidos en la partida de $2,900,000, para luego eliminar la que perteneciese a lucro cesante. El dictamen del foro apelativo de reducir de dicha partida una cantidad igual a la otorgada por menoscabo del potencial de generar ingresos hubiese sido válido sólo si dicha cantidad hubiese sido igual a la supuestamente concedida por lucro cesante. Pero el foro apelativo no tenía base alguna para suponer que dichas cantidades eran iguales, por lo cual lo que hubiese procedido era ordenar el desglose.

emitan los tribunales de instancia, a menos que las cuantías concedidas sean ridículamente bajas o exageradamente altas. Blas v. Hospital Guadalupe, supra; Rodríguez Cancel v. A.E.E., supra; Valldejully Rodríguez v. A.A.A., 99 D.P.R. 917 (1971).

En el caso de autos, el Tribunal de Primera Instancia concedió las siguientes cantidades:

(a) $750,000: "por concepto de daños físicos pasados, presentes y futuros, su incapacidad permanente y demás daños antes relatados"

(b) $325,000: "por concepto del menoscabo de potencial de generar ingresos"

(c) $2,900,000: "por todos los gastos futuros de cuido, transportación, dietas, lucro cesante y demás gastos misceláneos especiales antes relatados que debido a su incapacidad [del demandante] deberá incurrirse"

(d) $10,000: "por concepto de honorarios de abogados"

Como puede observarse, la cantidad total concedida al demandante en la sentencia suman **$3,985,000**, lo que es sustancialmente más alto que lo que hemos concedido en casos de naturaleza similar al de autos. Debe tenerse en cuenta que la suma en cuestión fue concedida como indemnización de los daños sufridos sólo por el menor Angel Hernández Nieves. La madre de éste, que compareció en representación de su hijo, no reclamó compensación por sus propios sufrimientos.

Hace unos años encaramos una situación muy parecida a la del caso de autos. En Riley v. Rodríguez De Pacheco, 119 D.P.R. 762 (1987), una recién nacida sufrió graves daños

cerebrales por razón de la impericia de los médicos que atendieron el parto. Dichos daños la incapacitaron física e intelectualmente de modo permanente. Como la menor no podía llevar a cabo una vida normal, habría de necesitar tratamientos, cuido y asistencia de otras personas durante toda su existencia. El tribunal de instancia le otorgó $800,000 por daños físicos y mentales, que consideramos exagerados. Los redujimos a $400,000 e indicamos que:

> "...llevados a extremos reales, los sufrimientos mentales y físicos son cuantificables al infinito. Sin unos límites razonables, la indemnización dejaría de tener la característica de resarcimiento para convertirse en una punitiva."

En el caso de autos, conforme a lo resuelto en Riley v. Rodríguez De Pacheco, supra, se debe reducir la partida de daños físicos de $750,000 que otorgó el foro de instancia. Siguiendo los parámetros del precedente referido, estimamos razonable la suma de $375,000.

En cuanto a las partidas otorgadas por concepto de menoscabo del potencial de generar ingresos y por concepto de gastos futuros de cuido y tratamiento, nos parece evidente que existe un elemento altamente especulativo en ellas. Ambas están fundadas en el supuesto de que el menor, a pesar de la severa incapacidad física y la retardación mental que sufre, habrá de vivir por lo menos hasta los setenta (70) años de edad. Por ello, siguiendo de nuevo el precedente de Riley v. Rodríguez de Pacheco, supra, estimamos razonable reducir dichas partidas de $325,000 y

$2,900,000 a las sumas de $162,500 y $1,450,000 respectivamente. Con arreglo a lo anterior, el total de la indemnización por las tres partidas referidas sumaría $1,987,500.

V

## Los honorarios de abogado

La Asociación de Garantía de Seguros Misceláneos nos planteó que la parte demandada no había incurrido en temeridad que justificase la condena de $10,000 en honorarios de abogado que le fue impuesta por el foro a quo.

El señalamiento es inmeritorio. El Tribunal de Primera Instancia determinó que la temeridad incurrida por la Universidad era patente, pues ésta había negado hechos que le constaban o que eran de fácil constatación. En su contestación a la demanda la U.P.R. negó toda su responsabilidad, la lesión del menor y su carácter incapacitante, y otros extremos similares, de lo cual se desprende con claridad la temeridad. El error no se cometió. Como la Universidad de Puerto Rico, por ser una corporación pública, no está exenta del pago de honorarios de abogados por temeridad, como sí lo está el E.L.A. al amparo de la Regla 44.3(b) de Procedimiento Civil, procede el pago de lo impuesto por el Tribunal de Primera Instancia. Véase, Rodríguez Cancel v. A.E.E., 116 D.P.R. 443, 460 (1985).

VI

Por los fundamentos expuestos, se dictará sentencia para modificar la del foro apelativo y disponer las siguientes cuantías como monto total de la reparación debida al demandante:

1)  por concepto de todos los daños
    físicos ............................. $  375,000

2)  por menoscabo del potencial de generar
    ingresos ...........................    162,500

3)  por concepto de gastos futuros de cuido
    y tratamiento .......................  1,450,000

4)  por honorarios de abogados ...........     10,000


JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Marta Nieves Cruz en Represen-
tación de Angel Luis Hernández
Nieves

    Demandantes-Apelados

        vs.                     CC-1998-876       Certiorari
                            Cons. AC-1998-47
Universidad de Puerto Rico;
Asociación de Garantía de
Seguros Misceláneos

    Demandados-Apelantes

SENTENCIA

San Juan, Puerto Rico, a 31 de mayo de 2000.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente, se dicta sentencia modificando la del foro apelativo y se disponen las siguientes cuantías como monto total de la reparación debida al demandante:

1) por concepto de todos los daños
   físicos ...................... $ 375,000

2) por menoscabo del potencial de generar
   ingresos ..................... 162,500

3) por concepto de gastos futuros de cuido
   y tratamiento ................ 1,450,000

4) por honorarios de abogado ....... 10,000

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal. Todos los Jueces participan por Regla de Necesidad. El Juez Asociado señor Hernández Denton disiente con opinión escrita, a la cual se unen la Juez Asociada señora Naveira de Rodón y el Juez Asociado señor Corrada del Río.

                        Isabel Llompart Zeno
                      Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

*Marta Nieves Cruz, en Represen-*
tación de Angel Luis Hernández
Nieves

    Demandantes-Apelados

       *Vs.*                            *CC-1998-876*
                          Cons. AC-1998-47     Certiorari

*Universidad de Puerto Rico;*
*Asociación de Garantía de*
*Seguros Misceláneos*

    Demandados-Apelantes

Opinión Disidente emitida por el Juez Asociado señor Hernández Denton a la cual se une la Juez Asociada señora Naveira de Rodón y el Juez Asociado señor Corrada del Río

San Juan, Puerto Rico, a 31 de mayo de 2000.

      *Aunque coincidimos con la Opinión del Tribunal a los efectos de que la Ley Núm. 98 de 24 de agosto de 1994, 26 L.P.R.A. sec. 4105, tiene efecto prospectivo, disentimos de la determinación mayoritaria de reducir las cuantías por concepto de daños concedidas por el Tribunal de Primera Instancia. Entendemos que el tribunal de instancia valoró de forma justa y adecuada los daños que sufrió el menor Hernández Nieves, y no existe base alguna en el expediente que justifique la reducción de dichas cuantías desde este estrado apelativo.*

*I.*

En 1983 Marta Nieves Cruz dio a luz a Ángel Luis Hernández Nieves en el Hospital de Área de Carolina.

Nieves Cruz, en representación de su hijo, presentó demanda en daños y perjuicios contra el Estado Libre Asociado,[6] la Universidad de Puerto Rico, y la Asociación de Garantía de Seguros Misceláneos. Alegó, en síntesis, que como resultado de las actuaciones negligentes de los médicos que le atendieron en el parto, el menor había sufrido lesiones permanentes, que incluían incapacidad física y retardación mental.

Después de varios incidentes procesales, y de la celebración del juicio correspondiente, el Tribunal de Primera Instancia declaró con lugar la demanda. Condenó a la Universidad de Puerto Rico a pagar las siguientes cantidades:[7]

(1) $325,000 por concepto del menoscabo del potencial de generar ingresos.

(2) $750,000 por concepto daños físicos pasados, presentes y futuros y la incapacidad permanente de Hernández Nieves.

(3) $2,900,000 por todos los gastos futuros de cuido, transportación, lucro cesante[8] y demás gastos misceláneos especiales.

(4) $10,000 por concepto de honorarios de abogado.

Los demandados presentaron sendos recursos de apelación ante el Tribunal de Circuito de Apelaciones, en los cuales alegaron, entre otras cosas, que las cuantías de daños concedidas por el Tribunal de Primera Instancia habían sido excesivas. El tribunal apelativo modificó la sentencia dictada por el tribunal de instancia, a los únicos efectos de restar la suma de $325,000 de la partida de $2,900,000.

Inconformes, los demandados recurren ante nos cuestionando, entre otros asuntos, las cuantías concedidas al demandado por el foro *a quo*.

---

[6] Posteriormente, el Tribunal de Primera Instancia desestimó la reclamación en cuanto al Estado Libre Asociado.

[7] Determinó que la responsabilidad de la Asociación de Garantía de Seguros Misceláneos se limitaba a la suma de $150,000.

[8] Coincidimos con la mayoría del Tribunal a los efectos de que la mención de lucro cesante dentro de dicha partida constituyó un error tipográfico.

Este Tribunal, sin más, reduce a la mitad dichas cuantías. Por las razones que expondremos a continuación, no podemos refrendar dicha determinación.

**II.**

En nuestro sistema de responsabilidad extracontractual la indemnización del daño tiene como fin restablecer al demandante al estado en que se encontraba antes de ocurrirle el daño, esto es devolver las cosas a su estado natural. Correa v. A.F.F., 83 D.P.R. 144 (1961). Esta reparación se denomina *reparación in natura o restitutio in integrum.* Sin embargo, esto resulta difícil, y muchas veces imposible. Por tanto, en muchas ocasiones se recurre a la alternativa de reparar el daño mediante la concesión de una suma de dinero que se establece como "equivalente" a la pérdida sufrida. Véase, Rodríguez Cancel v. A.E.E., 116 D.P.R. 443 (1985); Galib Frangie v. El Vocero de Puerto Rico, res. el 6 de junio de 1995, 139 D.P.R.__ (1995).

La valoración del daño constituye elemento fundamental en nuestro ordenamiento jurídico. Conceder cuantías insuficientes por concepto de daños sufridos tiene el efecto de aminorar la responsabilidad civil a la que deben estar sujetas las actuaciones antijurídicas. Antonio J. Amadeo Murga, El Valor de los Daños en la Responsabilidad Civil, Tomo I, 1997, pág. 31. Por el contrario, una valoración exagerada daría lugar al elemento punitivo, ajeno a nuestro sistema de derecho. *Id.*

Para que el sistema civil cumpla con sus propósitos, los tribunales debemos propiciar que se logre la más razonable proporción entre el daño causado y la indemnización concedida. *Id.* Sin embargo, reconocemos que la función de valorar el daño es sumamente difícil, particularmente cuando se trata de valorar daños no patrimoniales o daños morales. Blas Toledo v. Hospital de la Guadalupe, res. el 22 de julio de 1998, 98 TSPR 111.

La preocupación por la dificultad y complejidad de valorar los daños ha sido manifestada por este Tribunal en reiteradas ocasiones. Así, en Riley v. Rodríguez de Pacheco, 119 D.P.R. 762 (1987), indicamos:

"La determinación de una compensación justa y razonable por los daños sufridos [es] tarea que constituirá un reto aun para un Salomón del siglo XX. [Cita omitida]. La apreciación humana valorativa de elementos que no son ostensibles y visibles sino intangibles... no está exenta de cierto grado de especulación. Aspiramos a que toda adjudicación sea razonablemente balanceada, esto es, ni extremadamente baja como tampoco desproporcionalmente alta".

La gestión judicial de estimación y valoración de daños es sumamente complicada y angustiosa porque "no existe una tabla o computadora electrónica que recoja todos los elementos y premisas inarticuladas que nutren la valoración del dolor físico y mental humano, que permita, mediante la aplicación de unas teclas o el oprimir unos botones, obtener el resultado final apropiado". Urrutia v. A.A.A., 103 D.P.R. 643 (1975).

La tarea de valorar el daño descansa inicialmente en el ejercicio discrecional prudente, juicioso y razonable del juzgador de hechos animado por un sentido de justicia y de conciencia humana. Urrutia, supra. Los tribunales de instancia están en mejor posición que los tribunales apelativos para hacer esta evaluación. Ello es así, ya que, éstos tribunales son los que tienen contacto directo con la prueba presentada en el proceso judicial de primera instancia. Urrutia, supra; Blas Toledo, supra.

Así pues, a tenor con la referida norma de abstención judicial, este Tribunal no intervendrá con la estimación y valoración de daños que hagan los tribunales de instancia a menos que las cuantías sean ridículamente bajas o exageradamente altas. Valldejuli Rodríguez v. A.A.A., 99 D.P.R. 917 (1971); Riley, supra; Rodríguez Cancel, supra; Urrutia, supra. De ahí que la parte que solicita la modificación de las sumas concedidas a nivel de instancia venga obligada a demostrar la

existencia de circunstancias que hagan meritorio modificar las mismas. Rodríguez Cancel, *supra*.

Resulta pertinente puntualizar, que si bien es cierto que en algunos casos hemos hecho expresiones a los efectos de que los tribunales de instancia pueden utilizar como **guía o punto de partida** las sumas concedidas por este Tribunal en casos similares,[9] no menos cierto es que este factor no es determinante en la estimación de daños. Recuérdese que no hay dos casos exactamente iguales; cada caso se distingue por sus propias y variadas circunstancias. Es por ello que la decisión que se emita en un caso específico, en relación con la valoración y estimación de daños, no puede ser considerada como precedente obligatorio para otro caso. Toro Aponte v. E.L.A., res. el 31 de enero de 1997,142 D.P.R.___ (1997); Velázquez Ortiz, *supra*; Rodríguez Cancel *supra*. La valoración responde a factores particulares y únicos que no se prestan a extrapolación indiscriminada entre un caso y otro. La compensación otorgada a los demandantes ha de ser considerada conforme los hechos particulares del caso. Toro Aponte, *supra*.

Ahora bien, si un tribunal toma en cuenta como punto de partida pasadas valoraciones, las cuales, reiteramos, no constituyen un precedente obligatorio, es su deber actualizarlas. Ello debido a que el "valor" del dinero hoy día no es el mismo que hace, digamos diez o veinte años atrás por razón del alza en el costo de la vida que se experimenta en nuestra sociedad. Véase, Rojas v. Maldonado, 68 D.P.R. 818 (1948).

Con este trasfondo doctrinal acerca de la estimación y valoración de los daños en nuestro ordenamiento, resulta pertinente analizar los criterios que deben regir dicha determinación para cada una de las partidas específicas concedidas por el Tribunal de Primera Instancia en

---

[9]Véase, por ejemplo, Velázquez Ortiz v. U.P.R. 128 D.P.R 324 (1991); Molina Caro v. Dávila, 121 D.P.R. 362(1988).

el caso de autos. Examinemos, además, si dichas cuantías son razonables y adecuadas y si encuentran apoyo en la prueba desfilada ante el foro *a quo*.

### (A) Menoscabo del Potencial de Generar Ingresos

En Ruiz Santiago v. E.L.A., 116 D.P.R. 306, 310 (1985), reconocimos, por primera vez, la modalidad del lucro cesante llamada "menoscabo del potencial de generar ingresos". Este tipo de compensación no va dirigido a sustituir ingresos (porque la persona nunca había recibido un ingreso ni lo recibía en el momento del acto dañoso) sino a indemnizar mediante una suma global el potencial frustrado de generarlos. Rodríguez Cancel v. A.E.E., 116 D.P.R. 443 (1985). Tal es el caso en el que se causa incapacidad a un menor que no había recibido ingresos nunca, pero que tiene a su favor la presunción de que habría sido una persona de condiciones normales y que habría ganado lo que tal persona ganaría. Ruiz Santiago, *supra*; Pate v. U.S.A., 120 D.P.R. 566 (1988).

Reconocemos que la cuantificación y determinación de una compensación adecuada en dichas instancias conlleva unas complicaciones ya que este tipo de indemnización, al igual que otros tipos de daños, no están "inmunes de cierto grado de especulación". Ruiz Santiago, *supra*; Pate, *supra*. No obstante, hemos dicho que dichas dificultades no pueden servir de obstáculo en nuestra principal función de hacer cumplida justicia. *Id*. Así, la estimación de este tipo de daño dependerá de la consideración y ponderación de varios factores valorativos, sin apego a una fórmula aritmética rigurosa. La cuantía final específica será de "razonable aproximación judicial", ya que el criterio rector para la estimación de este tipo de daño es el de probabilidad. Ruiz Santiago, *supra*; Publio Díaz v. E.L.A., 106 D.P.R. 854, 871 (1978).

Ante la ausencia de un historial previo de actividad retribuida, los factores que deben tomarse en cuenta, al fijarse la cuantía por el menoscabo del potencial de generar ingresos, incluyen el *status* del menor al momento de la incapacidad y su proyección futura razonable. Ruiz Santiago, *supra*; Rodríguez Cancel, *supra*; Pate, *supra.* Otros factores a considerarse son: el tipo de núcleo familiar, grado de estabilidad del hogar, edad, condición de salud física y mental previa, inteligencia, su disposición, educación alcanzada, hábitos de estudio, habilidad en la escuela, talento, intereses específicos, entrenamientos y destrezas desarrolladas, grado de madurez y experiencia. *Id*. Las leyes de salario mínimo, los promedios de ingreso en las variadas ocupaciones o profesiones prevalecientes, y los sistemas de retiro o la edad promedio de retiro forman parte del cuadro total. *Id.*

Todos estos factores y aquellos adicionales que provean mejores elementos de juicio, servirán al juzgador para iluminar su conciencia y valorar e indemnizar global y equitativamente el menoscabo del potencial de generar ingresos. Ruiz Santiago, *supra*.

En la valoración de este tipo de daño patrimonial sirven de ayuda las estadísticas y ciencias económicas que permiten hacer unas proyecciones. Los jueces, con la ayuda de peritos en diferentes áreas, pueden hacer un cálculo educado y razonable de ese daño patrimonial.

En el caso de marras es incuestionable la procedencia de la partida por menoscabo del potencial de generar ingresos. Es un hecho no controvertido que la incapacidad física y mental del menor Hernández Nieves le impedirá tener un empleo que le permita generar ingresos.[10] Opera a su favor la presunción de que habría sido una persona de condiciones normales y que habría ganado lo que tal persona ganaría.

El tribunal de instancia al fijar la cuantía de $325,000 por la partida del menoscabo del potencial de generar ingresos, tomó como punto de partida el informe del perito economista Dr. Jorge Freyre, el

cual fue presentado por la parte demandante. Especial énfasis merece el hecho de que dicho informe fue admitido en evidencia **sin la oposición de la parte demandada.**[11] **Los demandados tampoco contradijeron dicho informe.**

Al hacer el cálculo, el Dr. Freyre consideró una expectativa de vida de 70.26 años[12] y tomó en cuenta los factores esbozados en Ruiz Santiago, *supra*. El Dr. Freyre le proveyó al tribunal dos alternativas con relación al cómputo de la partida del menoscabo del potencial de generar ingresos. Por un lado, concluyó que el resultado del cómputo era $325,000 si se tomaba como base la probabilidad de empleo del universo de varones en Puerto Rico. El menoscabo del potencial de generar ingresos ascendería a $500,000 si se tomaba en consideración el historial de empleo del padre del menor. El Tribunal de Primera Instancia, en el ejercicio de su discreción, al evaluar las alternativas ofrecidas, escogió **la menor** de las dos, es decir concedió $325,000, basándose en el cómputo más conservador. Esto a pesar de que, como vimos, existía base suficiente en la prueba presentada para conceder una cuantía mayor.

El tribunal de instancia estableció la cuantía por la partida del menoscabo de potencial de generar ingresos a tenor con los criterios expuestos jurisprudencialmente por esta Curia y conforme a la prueba desfilada. Mas aun, como señalamos anteriormente, basó su determinación en el cálculo más conservador.

Aun así, la mayoría de este tribunal reduce a la mitad la partida en cuestión, es decir, reduce la cuantía de $325,000 a $162,500 sin un análisis ulterior de la prueba pericial y **no contradicha** por los demandados. ¿Qué criterios objetivos tiene este tribunal para disminuir

---

[10] Tal conclusión encuentra apoyo en los testimonios de los peritos Dr. Agustín García y Dr. Allan Hansknecht.
[11] Sentencia del Tribunal de Primera Instancia, pág.12.
[12] Esta expectativa de vida está acorde con el testimonio del perito Dr. Allan Hausknecht sobre la mortalidad de las personas que sufren de condiciones similares a las de Hernández Nieves. Sentencia del Tribunal

dicha cuantía? Ninguno. ¿Qué datos han ofrecido los demandados que contradigan los ofrecidos por el perito economista Dr. Freyre, que nos permitan evaluar la "razonabilidad" de la valorización que se hizo de este tipo de daño? Ninguno. Nada hay en el expediente, fuera de alegaciones en el vacío de los demandados de que dicha cuantía es "excesiva", que amerite dejar reducir la misma.

Consideramos, pues que la cantidad concedida por el Tribunal de Primera Instancia de $325,000 en concepto del menoscabo de potencial de generar ingresos, es justa y razonable[13] y encuentra apoyo en la evidencia que consideró el foro *a quo*.

## (B) Daños Físicos y Mentales

Este Tribunal consideró como una cantidad "razonable" por concepto de daños físicos y mentales sufridos por el menor Hernández Nieves la cantidad de $375,000, a pesar de que el tribunal de instancia concedió el doble, es decir, $750,000. Al evaluar la razonabilidad de dicha partida este Tribunal tomó como punto de comparación el caso de <u>Riley v. Rodríguez de Pacheco</u>, 119 D.P.R. 762 (1987). Esto por ser un caso "parecido" al presente caso en vista de que allí una recién nacida, por razón de la impericia médica de los médicos que atendieron el parto, sufrió incapacidad física y mental permanente.

En aquella ocasión consideramos razonable la cuantía de $400,000 en concepto de daños físicos y mentales. Nos parece increíble que la mayoría tome como punto de partida el caso de <u>Riley</u>, *supra*, que según sus propias palabras es un caso muy "parecido al caso de autos", no para conceder **al menos** lo que allí se concedió, sino para **reducir** la cuantía concedida en el presente caso a una cantidad **menor** ($375,000) a la otorgada en <u>Riley</u>, *supra*.

Hay más, trece (13) años después de nuestra decisión en <u>Riley</u>, *supra,* y veintiséis (26) años después de los hechos que dieron lugar a

---

de Primera Instancia, pág. 12; T.E. Testimonio del Dr. Allan Hausknecht, pág. 30.

dicha decisión, este Tribunal utiliza dicho caso como guía pasando por alto que la suma allí concedida indudablemente tiene que ser actualizada. Es una realidad innegable que el "valor" del dinero hoy día no es el mismo que hace trece (13) o veintiséis (26) años atrás por razón del alza en el costo de la vida.

Resulta interesante destacar que lo que constituía $400,000 hace trece (13) años, podría constituir hoy día una cantidad que supera el millón de dólares.[14] El tribunal de instancia, tomando en cuenta el valor actual del dinero, pudo haber otorgado dicha suma, si hubiese usado como referencia el caso de Riley, *supra.* Sin embargo, una vez más optó, en el ejercicio razonable de su discreción, por un cálculo conservador y concedió la cantidad $750,000.

Aun si no tomáramos como guía el caso de Riley, *supra,* como hizo la mayoría de este Tribunal, entendemos que la cantidad concedida por el tribunal de instancia en concepto de los daños físicos y mentales sufridos por Hernández Nieves no es excesiva ni exagerada. De un análisis minucioso de las declaraciones de los peritos, los cuales le merecieron entera credibilidad al foro de instancia, se desprende que Hernández Nieves padece, **entre otras condiciones**, de parlesía cerebral, estrabismo, displejía espástica, atrofia óptica y varios tipos de anomalía relacionadas a la cadera y piernas. Es dependiente para todos los quehaceres cotidianos de la vida, es decir depende de otras personas, por ejemplo, para su cuido, alimentación, aseo, vestido, y para ir a sus citas médicas y tratamientos.[15]

Respecto a los daños morales, basta decir, como señaló el juez sentenciador, que la incapacidad física del menor supone "una alteración significativa de su vida familiar y afectiva". El menor, "ha

---

[13] Dicha cantidad se reduce en términos reales a una indemnización anual de $5,701 anuales y de $15.61 diarios, lo cual no tiene nada de exagerado o punitivo, como alegan los demandados.

[14] Tomando como punto de partida una tasa de interés de 8%, el cálculo exacto sería $1,087,868. Véase Kieso & Weygant, Intermediate Accounting, 8va Edición, 1994, pág. 303.

[15] Véase, Testimonio del perito Dr. Allan Hausknecht, T.E. pág.74.

sufrido y sufrirá aprensión, privaciones, humillaciones, molestosos y continuos tratamientos, desvelos, teniendo que ser sometido a delicados e innecesarios tratamientos".[16]

De manera que, a la luz de todo lo antes dicho, consideramos que no abusó de su discreción el tribunal de instancia al conceder la cantidad de $750,000 en concepto de daños físicos y mentales sufridos por Hernández Nieves. No se justifica reducir dicha cuantía.

### (C) Daños Especiales

Los daños especiales son aquellos desembolsos o pérdidas que reducen en forma específica el patrimonio y que son consecuencia directa de la lesión. Herminio Brau del Toro, Los Daños y Perjuicios Extracontractuales en Puerto Rico, Tomo I, pág. 433. Incluyen, entre otros, gastos médicos, medicinas, gastos de hospitalización y convalecencia, enfermeras especiales, terapias, y cualquier tipo de asistencia especial requerida. Id.

En el presente caso el Tribunal de Primera Instancia concedió una suma de $2,900,000 en concepto de daños especiales. En la demanda interpuesta se hicieron reclamos por gastos pasados y futuros de transportación, dietas, médicos, hospitales y otros que todavía se desconocen pero que necesariamente se incurrirán en el tratamiento y cuido especial que requerirá Hernández Nieves a través de los años.

El Tribunal de Primera Instancia determinó la suma en dicho concepto a base de un estimado hecho por el perito Dr. Allan Hansknecht. Este perito testificó, entre otras cosas, que el costo de cuido y tratamiento promedio de las personas con condiciones médicas similares a las que tiene Hernández Nieves es de $50,000 a $60,000 del primer año a los 16 o 17 años de edad; entre $70,000 y $75,000 de los 17 a 25 años; y de $60,000 al año cuando esté institucionalizado por no tener a sus padres u a otro familiar cercano que se ocupen de él.[17]

---

[16] Sentencia del Tribunal de Primera Instancia, pág.12.
[17] Véase, Testimonio del perito Dr. Allan Hausknecht, T.E. pág. 42-47.

El tribunal de instancia entendió que era razonable tomar como base la suma **menor**, es decir, la de $50,000,[18] a pesar de tener base razonable en la prueba conceder unas cuantías más altas, a base del incremento en gastos que supone el crecimiento del menor. Pero hay más, el tribunal de instancia, computó esta cuantía tomando como base la edad del menor **al momento de dictarse la sentencia** (13 años). No tomó en cuenta en el cálculo, **pudiendo hacerlo**, los gastos especiales en los que se había incurrido antes de dictar la sentencia. Aun así este Tribunal decide reducir dicha partida de $2,900,000 a $1,450,000. En otras palabras, reduce la cuantía a la mitad, sin justificación alguna. Nuevamente, diferimos de dicha actuación.

III.

De la anterior discusión podemos colegir que el Tribunal de Primera Instancia, al determinar la cuantía de cada una de las partidas de daños, examinó **toda la prueba y las diversas alternativas que de esta prueba podían ser consideradas**. A tenor con su prudente discreción judicial, siempre optó por los cálculos **más conservadores y más bajos**. Un examen cuidadoso del expediente, incluyendo los autos de instancia, revela que la determinación y computación de los daños encuentra amplio apoyo en la evidencia presentada. No hallamos fundamento alguno que justifique alterar las cuantías de daños.

En este caso los daños no fueron especulativos, como arguye la mayoría de este Tribunal. Se probó la existencia de los daños y que su causa próxima fue las acciones u omisiones de los demandados. La determinación de la cuantía, aun cuando pueda ser aproximada, debe sostenerse si el cálculo descansa en base razonable y no en el capricho o la adivinación. El derecho de compensación no puede derrotarse sólo por el carácter especulativo que en alguna medida supone el cómputo de daños.

---

[18] El Tribunal de Instancia multiplicó dicha cuantía por el número de años que le quedaban a Hernández Nieves para llegar a la edad de 70

Tampoco constituyen las cuantías concedidas una medida punitiva, como sugiere este Tribunal. Es impermisible interpretar que probados unos hechos, sufridos unos daños, la compensación otorgada, aunque sea la justa, si se considera alta, debe reducirse bajo el manto de que la misma es "exageradamente alta" o constituye una "medida punitiva".

Coincidimos con el Tribunal de Circuito a los efectos de que no puede perderse de vista que al compensar un daño no estamos premiando a nadie; no estamos convirtiendo al pobre en rico de la noche a la mañana como si se tratara de un juego de lotería. **Lo que realmente hacemos es justicia tratando de poner al que sufre el daño en la posición en que más o menos estaría de no haberlo sufrido.**

Por entender que la Opinión del Tribunal comete una gran injusticia sobre una familia que ya ha sufrido una gran tragedia, causada por la impericia profesional de los médicos de la Universidad de Puerto Rico, disentimos.


FEDERICO HERNÁNDEZ DENTON
JUEZ ASOCIADO

---

años. A base de $50,000 por año la cantidad total debió ser $2,850,000. No obstante, el tribunal de instancia concedió $2,900,000.