

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Miguel Sagardía De Jesús Et als. <br><br> Peticionarios <br><br> v. <br><br> Hospital Auxilio Mutuo Y otros <br><br> Recurridos | Certiorari <br><br> 2009 TSPR 173 <br><br> 177 DPR \_\_\_\_ |

Número del Caso: CC-2005-1263

Fecha: 12 de noviembre de 2009

Tribunal de Apelaciones:

      Región Judicial de San Juan

Juez Ponente:
           Hon. Aleida Varona Méndez

Abogados de la Parte Peticionaria:

           Lcdo. Harry Anduze MontaÑo
           Lcdo. Rafael A. García López
           Lcdo. Raúl S. Mariani Franco

Abogado de la Parte Recurrida:

           Lcdo. José A. Rivera Cordero

Materia: Daños y Perjuicios

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correccione s del proceso de compilación y publicación oficial de las decisio nes del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Miguel Sagardía De Jesús
et als.

    Peticionarios                CC-2005-1263        Certiorari

        v.

Hospital Auxilio Mutuo
y Otros

    Recurridos

Opinión del Tribunal emitida por el Juez Asociado señor Kolthoff Caraballo

San Juan, Puerto Rico, a 12 de noviembre de 2009.

En el presente caso nos corresponde determinar si procede la reducción de una suma acordada en una transacción celebrada entre los demandantes y unos codemandados, de la cuantía total concedida como daños. Esto, en instancias en las cuales posteriormente no se le atribuya responsabilidad en el acto torticero a los codemandados relevados por el acuerdo de transacción. Igualmente, debemos resolver si un hospital responde vicariamente por actos de impericia médica cometidos por un médico contratista independiente que laboraba en una franquicia exclusiva que brindaba

servicios de anestesiología a los pacientes de dicha institución. Además, debemos considerar si procedía la reducción de la compensación concedida a los demandantes por los daños físicos que sufrió su hijo, por éste no haber estado consciente durante varios días.

I

Las determinaciones de hechos esenciales son las siguientes.

A mediados del año 1992, la señora Rita M. Deliz Cordero quedó embarazada y estuvo recibiendo tratamiento prenatal con el grupo de ginecólogos-obstetras compuesto por los doctores Arsenio Comas Urrutia, Ubaldo Catasús y Juan Figueroa Longo, bajo el cuidado principal del Dr. Comas. El embarazo fue normal y no hubo evidencia de problema alguno con el feto durante la gestación. En la mañana del 2 de abril de 1993, la señora Deliz acude al Hospital Auxilio Mutuo (Hospital) por órdenes del Dr. Comas, por ésta estar de parto activo. Al ser examinada en el Hospital, el Dr. Comas procedió a abrirle las membranas (conocido como "romper fuente") y el líquido amniótico reflejó presencia de meconio[1] ("meconium stain"). En esos momentos no se observaba progreso en el parto, por lo que el médico determinó que probablemente la señora Deliz debía ser sometida a una cesárea.

---

[1] El meconio es el "material que se acumula en el intestino del feto y que forma las primeras heces del recién nacido. La presencia de meconio en el líquido amniótico durante el parto puede indicar sufrimiento fetal." Diccionario Mosby, Medicina, Enfermería y Ciencias de la salud, Edit. Elsevier, Madrid, 6ta edición, 2003, V. I, pág. 997.

A las 11:30 a.m., como el parto no progresaba y existía desproporción céfalo pélvica, sumado a la presencia de meconio previamente detectada, el Dr. Comas decidió proceder con un parto mediante cesárea. Antes de realizarse la cesárea, no se realizaron gestiones para que, durante el parto, estuviera presente un pediatra u otro personal médico adiestrado, aunque se tenía conocimiento de la presencia del meconio. No hubo pediatra disponible durante el parto, aun cuando el Hospital contaba para esa fecha con pediatras y neonatólogos en su facultad médica. Durante el parto estuvo presente el personal médico siguiente: el Dr. Comas, el Dr. Miguel A. Eliza García (anestesista), una anestesista y dos enfermeras ("circulating" y "scrub nurse").

A las 12:16 p.m. nació Miguel Alfonso, un bebé varón de 9 libras y 6 onzas, con el cuerpo cubierto de meconio. Al nacer, el Dr. Comas, conforme al procedimiento de rigor, succionó al bebé por la boca y luego por la nariz. Inmediatamente después, el bebé lloró y entonces lo entregó al Dr. Eliza, asumiendo éste la responsabilidad por su atención, pues no había en sala otra persona con el adiestramiento y experiencia en el manejo de un bebé recién nacido.

El Dr. Eliza le succionó a Miguel Alfonso 4cc de meconio, le aplicó oxígeno, lo intubó endotraquealmente y

utilizó un laringoscopio.[2] Además, se le otorgó un "Apgar Score"[3] de 7 al nacer y de 9 a los cinco minutos. Sin embargo, no surge del récord quién o quiénes otorgaron el "Apgar" ni qué criterios se tomaron para adjudicar la puntuación. Durante el juicio, el Dr. Eliza testificó que fue él quién lo otorgó, debido a que el récord médico no ofrece mucha claridad. Más bien adolece de múltiples deficiencias y crasas omisiones.[4]

Al examinar al recién nacido Miguel Alfonso en el "nursery", el pediatra en turno (Dr. Sánchez) procedió a succionarlo nuevamente. Además de los 4cc de meconio succionados por el Dr. Eliza en Sala de Operaciones, se le

---

[2] Sin embargo, aunque del récord no surge claramente de dónde se extrajeron los 4cc de meconio al bebé, el Dr. Eliza declaró en corte que extrajo el meconio del estómago. Tampoco está claro qué método se utilizó para suplirle el oxígeno, cuál fue la razón para utilizar un laringoscopio y qué resultó de su utilización, cómo se intubó al bebé y cómo se desarrolló el procedimiento. Aparecen marcadas todas las medidas de resucitación pero no se explica o detalla cuándo, cómo, cuántas veces y por qué se llevaron a cabo dichas medidas.

[3] El "Apgar Score" es una evaluación de la condición física de los niños recién nacidos al primer minuto y a los cinco minutos de nacido. Se le asigna un valor de 0 a 2 a cada uno de los cinco criterios a evaluar. Los criterios son: el ritmo cardiaco, la respiración, el tono muscular, respuesta a la estimulación y el color de piel. La puntuación máxima es de 10. El "Apgar Score" es utilizado para conocer la condición del recién nacido. *Véase*, J.E. Schmidt, Attorney´s Dictionary of Medicine, LexisNexis Matthew Bender, 2003, Vol. 1 A-CG, Pág. A-475

[4] Hay una ausencia total de datos en el récord médico que expliquen cuál fue el tratamiento médico brindado por el Dr. Eliza al bebé en la Sala de Operaciones. No existe anotación que documente con claridad y detalle las circunstancias que rodearon el manejo y tratamiento del bebé al nacer. Tampoco refleja quién ordenó su traslado de Sala de Operaciones al "Nursery". Aún cuando el Dr. Eliza administró todas las medidas de resucitación al bebé, lo que refleja una situación de cuidado, fue trasladado con un escolta al "Nursery" en una incubadora corriente sin personal médico alguno. Además, quedó evidenciado que previo a su transferencia al "Nursery", al menos durante 17 minutos, el bebé fue desatendido en Sala de Operaciones, sin seguimiento o medidas especiales a pesar de los procedimientos o medidas especiales de resucitación que le fueron impartidas por el Dr. Eliza.

extrajeron 7cc de meconio del estómago y casi 1cc de la tráquea. Ante el riesgo de un proceso infeccioso, el Dr. Sánchez ordenó la administración de antibióticos. Sin embargo, los antibióticos fueron ordenados a la 1:00 p.m. y fueron administrados por las enfermeras del hospital a las 3:15 p.m. No fue hasta las 3:30 p.m. cuando se cumplimentaron todas las órdenes médicas dadas.

A las 4.55 p.m. se confirmó que Miguel Alfonso tenía pulmonía. Ante este cuadro y el deterioro continuo del recién nacido, el Dr. Sánchez, en comunicación con el Dr. Jaunarena (pediatra de la familia) decidió trasladarlo al Hospital Damas en Ponce a una Unidad de Cuidado Intensivo Neonatal, ya que el Hospital Auxilio Mutuo no contaba con una para ese entonces.

A las 5:30 p.m., el Dr. Ochoa (neonatólogo) del Hospital Damas de Ponce aceptó el traslado del bebé a esa institución. Debido a que el Hospital Auxilio Mutuo no tenía protocolo para ello, no fue hasta las 7:15 de la noche que se pudo transportar a Miguel Alfonso al Hospital Damas en ambulancia. Durante el viaje, el recién nacido fue acompañado por el Dr. Sánchez, una técnica de terapia respiratoria, una enfermera de intensivo y dos paramédicos.

Una vez admitido en la Unidad de Cuidado Intensivo del Hospital Damas en horas de la noche del 2 de abril de 1993, el bebé continuó recibiendo tratamiento médico. Pese a los cuidados brindados, su condición respiratoria

empeoró. Ante esta situación, los médicos del Hospital Damas le aconsejaron a los demandantes que trasladaran al recién nacido a los Estados Unidos, a una institución hospitalaria que tuviera una máquina especializada llamada *Extral Corporal Membrane Oxygenation*" (ECMO).

Así las cosas, el bebé fue trasladado en ambulancia aérea al Miami Children´s Hospital donde fue colocado en ECMO. Estuvo bajo tratamiento en el Hospital de Miami desde el 4 de abril de 1993, siendo su cuerpecito sometido a estar lleno de agujas y tubos. Además, lo mantuvieron en el área de cuidado intensivo dentro de una máquina a través de la cual podían introducirse las manos mediante unas aberturas, para darle tratamiento médico que requería. Allí, estuvo acompañado en todo momento de su padre, el señor Sagardía De Jesús, hasta que su madre, la señora Deliz Cordero le fue permitido viajar y pudo acompañarlo también. Durante su estadía en dicho Hospital, ambos progenitores contemplaron impotentes el deterioro de su primogénito, hasta que entre otras complicaciones, Miguel Alfonso sufrió un paro cardíaco que lo mantuvo en estado comatoso desde el 23 de abril hasta su fallecimiento el 27 de abril de 1993.

Ante esta situación el señor Miguel E. Sagardía De Jesús, la señora Rita M. Deliz Cordero y la sociedad legal de gananciales constituida entre ellos instaron una acción por daños y perjuicios contra el Hospital y los ginecólogos-obstetras Comas Urrutia, Catasús y Figueroa

Longo, además contra el anestesiólogo Eliza García. Alegó la parte demandante que, como consecuencia de las actuaciones y omisiones negligente de la parte demandada, se produjo el fallecimiento de Miguel Alfonso veinticinco (25) días después de su nacimiento.

Antes de comenzar el juicio, los demandantes desistieron con perjuicio de su reclamación contra los doctores Comas, Catasús y Figueroa Longo mediante un acuerdo de transacción privado. Conforme a dicho acuerdo, los demandantes exoneraron a los codemandados antes mencionados de su responsabilidad hacia éstos y los demás codemandados. Los codemandados exonerados a su vez, se obligaron a pagar la cantidad de doscientos mil dólares ($200,000.00) a los demandantes. El Tribunal de Primera Instancia dictó sentencia parcial de conformidad, permaneciendo en el pleito el Hospital y el Dr. Eliza.

Durante la discusión de la transacción en el primer día de juicio, según se desprende de la transcripción de la vista, los codemandados manifestaron en corte abierta que no interesaban reclamar partida alguna de los codemandados relevados.[5] Además, la Jueza que condujo los procesos, claramente y con la anuencia de todas las partes, permitió al Hospital y al Dr. Eliza presentar

---

[5] Véase, *Addendum* I de la Petición de *certiorari* a la pág. 28.

prueba sobre la responsabilidad de los codemandados liberados, si así lo entendían pertinente.[6]

Celebrado el juicio, y luego de apreciar la extensa prueba desfilada y escuchar los testimonios vertidos, el tribunal declaró con lugar la demanda y condenó a los codemandados (Hospital Auxilio Mutuo y Dr. Eliza) a resarcir solidariamente a los demandantes por los daños sufridos. Determinó que era más probable que el bebé hubiera sobrevivido si hubiese recibido una atención médica más temprana de forma continua y consistente por parte del Dr. Eliza, el personal de enfermería del Hospital y de éste como institución hospitalaria.

El tribunal concluyó que el Dr. Eliza asumió la responsabilidad del bebé al nacer y negligentemente no solicitó la presencia de un pediatra, neonatólogo, ni de ningún otro profesional. Respecto al récord médico, concluyó que la falta de anotaciones por parte del Dr. Eliza era alarmante e injustificable. Determinó además que, aún cuando no es inusual la presencia de meconio y su aspiración, al ser advertida, es necesario hacer una intervención rápida y adecuada para lograr su mayor extracción y así evitar o disminuir los daños que pueda causar al bebé. Concluyó que si al llegar el bebé al "Nursery" le fueron extraídos 7cc de meconio en su estómago y 1cc de su tráquea por el pediatra, ello fue

---

[6] Véase, *Addendum* I de la Petición de *certiorari.*

resultado de una extracción negligente por parte del Dr. Eliza.

En consecuencia, el tribunal concluyó que el Dr. Eliza fue negligente al no extraer todo el meconio aspirado por el bebé, lo que provocó daños que causaron su posterior deceso. En específico, expresó que la intervención del Dr. Eliza con el bebé fue corta, inadecuada, falta de continuidad y no documentada en el récord médico. Respecto al Hospital, concluyó que era solidariamente responsable ante los demandantes.[7] El tribunal les condenó a pagar solidariamente la cantidad de ochocientos nueve mil setecientos setenta y ocho dólares con cincuenta y dos centavos ($809,778.52).[8] Además, el

---

[7] Entre las desviaciones principales de la mejor práctica de la medicina que fueron cometidas por el Hospital, según determinó el tribunal están las siguientes:
1. No proveer personal suficiente adiestrado en Sala de Operaciones para atender al bebé que se conocía y que estaba expuesto a meconio;
2. Llevar y permitir que sus empleados cumplimentaran un récord insuficiente con serias contradicciones y omisiones que invalidan su utilización para describir de forma precisa el tratamiento brindado;
3. Tener y mantener un contrato de exclusividad con la firma de anestesiología de la cual el Dr. Eliza formaba parte delegando en dicho grupo, sin supervisión alguna, la determinación del personal y equipo necesario en sus salas de operaciones;
4. La omisión del personal de enfermería y de recién nacidos de reconocer la condición de cuidado que presentaba el bebé y dar aviso con premura al pediatra de turno para su atención;
5. La falta de personal de enfermería de seguir las órdenes médicas en un término razonable y de forma adecuada;
6. Su omisión de tener un protocolo establecido para el traslado de recién nacidos a una sala de intensivo neonatal cuando fuera necesario.
7.

[8] Dicha cantidad está constituida por las siguientes partidas: ($6,857.00) por el costo de la ambulancia aérea; ($828.52) por los gastos de alojamiento en el Miami Children´s Hospital; ($684.00) por los gastos de la funeraria en Miami; ($650.00) por los gastos de la funeraria en Puerto Rico; ($759.00) por los gastos de pasajes aéreos; ($50,000.00) a ambos demandantes por la causa de acción de su hijo por

tribunal le impuso a los demandados el pago de las costas, gastos y honorarios de abogado por temeridad por la suma de cuatro mil dólares ($4,000.00) e intereses al 5.25% prevaleciente.

Así pues, a la luz de la prueba presentada, el tribunal de instancia dictaminó que los únicos responsables del evento dañoso fueron los codemandados Dr. Eliza y el Hospital. Por tal razón, aunque éstos presentaron una moción de determinaciones de hechos y conclusiones de derecho adicionales, solicitando la determinación de responsabilidad de los codemandados relevados, la Jueza la declaró no ha lugar.

El Hospital y el Dr. Eliza acudieron ante el Tribunal de Apelaciones mediante recursos de apelación separados, los cuales fueron consolidados. El Tribunal de Apelaciones emitió una extensa sentencia y después de discutir en detalle los planteamientos de los demandados, modificó la sentencia del Tribunal de Primera Instancia señalando que el Hospital no incurrió en negligencia por el hecho de éste tener y mantener un contrato de exclusividad con la firma de anestesiología de la cual el Dr. Eliza formaba parte delegando en dicho grupo, sin supervisión alguna, la determinación del personal y equipo necesario en sus salas de operaciones. De igual manera, resolvió que no se

---

el dolor físico sufrido por éste a razón de $2,000.00 por 25 días; ($350,000.00) por las angustias mentales sufridas por la señora Deliz en su acción directa; y ($400,000.00) por las angustias mentales sufridas por el señor Sagardía.

estableció el nexo causal entre el daño causado y el hecho que el Hospital no contara con un protocolo para el traslado de infantes en condición crítica a una unidad hospitalaria de cuidado terciario. No obstante, se sostuvo la determinación de solidaridad entre el Hospital y el Dr. Eliza que había hecho el Tribunal de Primera Instancia.

Asimismo, el Tribunal de Apelaciones modificó la partida de cincuenta mil dólares ($50,000.00) concedida a los demandantes por el dolor físico sufrido por su hijo a razón de dos mil dólares ($2,000.00) por 25 días y la redujo a un periodo de 17 días, para un total de treinta y cuatro mil dólares ($34,000.00). El foro intermedio entendió que al ser una compensación sustentada en los dolores físicos del bebé, procedía la reducción de aquellos días que conforme al expediente y la prueba presentada éste estuvo sedado y/o en estado de coma. Por consiguiente, al no sentir dolor durante ocho (8) días no podía ser compensado por los dolores físicos no percibidos en esos días.

El Tribunal de Apelaciones también redujo del monto total de la indemnización la cantidad de doscientos mil dólares ($200,000.00) ya satisfecha a los demandantes en virtud del acuerdo de transacción con los co-demandados relevados. Así modificada, se confirmó la sentencia apelada.

Ninguna de las partes estuvo conforme con esta sentencia, por lo cual recurrieron ante este foro mediante

sus respectivos recursos. No obstante, los recursos del Hospital Auxilio Mutuo y del Dr. Eliza no fueron acogidos por este Tribunal. Por su parte, en el recurso ante nos los demandantes plantearon los siguientes errores:

i. Cometió error el Tribunal de Apelaciones al modificar la Sentencia dictada por el Tribunal de Primera Instancia y de esa forma reducir de la cuantía concedida como daños a los demandantes-peticionarios, la suma total de la transacción entre los demandantes-peticionarios y los doctores Comas, Catasús y Figueroa Longo.

ii. Cometió error el Tribunal de Apelaciones al modificar la Sentencia dictada por el Tribunal de Primera Instancia y al determinar que el Hospital Auxilio Mutuo no es responsable por no contar para el 1993 con un protocolo para el traslado de infantes en condición crítica a una unidad terciaria.

iii. Cometió error el Tribunal de Apelaciones al modificar la Sentencia dictada por el Tribunal de Primera Instancia y reducir la compensación concedida a los demandantes por daños físicos experimentados por el recién nacido.

iv. Cometió error el Tribunal de Apelaciones al modificar la Sentencia dictada por el Tribunal de Primera Instancia al no imponer responsabilidad vicaria al Hospital Auxilio mutuo por las actuaciones del doctor Eliza aún cuando se demostró que el grupo de Anestesiólogos para el que trabajaba el Dr. Eliza era contractualmente responsable por tener el personal diestro disponible que fuera necesario en sala de parto en todo momento.

Estando en condiciones de resolver, procedemos a así hacerlo.

**II.**

En cuanto al primer error, los peticionarios alegan que el Tribunal de Apelaciones erró al restar la suma

producto de una transacción entre éstos y unos codemandados de la cuantía total que se les concedió por concepto de daños. Tienen razón los peticionarios.

**A.**

Los principales elementos constitutivos de un contrato de transacción son: 1) la existencia de una controversia o relación jurídica incierta litigiosa; 2) la intención de las partes de sustituir –mediante la transacción– la incertidumbre sobre los elementos objetivos de la relación jurídica por otra "cierta e incontestable"; 3) concesiones recíprocas.[9] La antecedida incertidumbre, en la mayoría de los casos, es la causa de la transacción. Las partes, al transigir, podrían encontrarse en un estado de incertidumbre en torno a la razón jurídica que les asista y la ignorancia objetiva del resultado del pleito o pleito futuro; esa incertidumbre es lo que normalmente les mueve a transigir.[10]

Por consiguiente, por virtud del contrato de transacción las partes sustituyen dicha incertidumbre con la certeza del contrato. Además, al transar, ambas partes asumen el riesgo –de haber pagado más o recibir menos– con el fin de evitar o finalizar un litigio.

---

[9] Art. 1709 del Código Civil, 31 L.P.R.A. sec. 4821; US Fire Insurance Company v. A.E.E., res. el 24 de septiembre de 2008, 2008 T.S.P.R. 160, 174 D.P.R. __; Mun. de San Juan v. Professional Research & Community Services, res. el 18 de mayo de 2007, 2007 T.S.P.R. 95.

[10] L.R. Rivera Rivera, El Contrato de Transacción, sus efectos en situaciones de solidaridad, Jurídica Editores, 1998, pág. 37 (citando a Cossío y Corral).

**B.**

En los pleitos de daños y perjuicios, la víctima puede renunciar a su reclamación con alguno de los co-causantes de un daño, mediante un contrato de transacción. Además, esta situación puede ocurrir en supuestos de pluralidad de sujetos. En los últimos años hemos elucidado los efectos que produce este tipo de contrato en los supuestos de solidaridad de los pleitos de daños y perjuicios con pluralidad de sujetos. Hemos sostenido que dependiendo de lo pactado, así serán los efectos de ese acuerdo sobre el co-causante o codemandado con quien se transa y los demás que permanezcan en el pleito.[11] Por consiguiente, es de vital importancia establecer qué fue lo que se pactó y poder acertar el alcance de dicha transacción.[12]

Recientemente, en US Fire Insurance v. A.E.E., res. el 24 de septiembre de 2008, 2008 T.S.P.R. 160, 174 D.P.R. __, clarificamos la normativa sobre los efectos de una transacción tanto en la relación interna entre codemandados solidarios como en la relación externa entre codemandados y demandantes. Expresamos que en la situación en la cual la víctima exonera de responsabilidad a uno de los codemandados, ello no acarrea el relevo de los otros codemandados, si esto último no surge claramente del

---

[11] US Fire Insurance Company v. A.E.E., supra; S.L.G. Szendrey v. Hospicare Inc., 158 D.P.R. 648, 656 (2003); Blas Toledo v. Hospital Nuestra Señora de la Guadalupe, 167 D.P.R. 439 (2006).

[12] Art. 1714 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 4826.

acuerdo de transacción.[13]  Con lo cual, la víctima puede continuar su reclamación contra los restantes codemandados.

Por su parte, los efectos que una transacción pueda tener sobre los codemandados que no transigieron dependerá de lo pactado entre el demandante y el codemandado liberado. Puede darse el caso en el cual a través del acuerdo de transacción la víctima libere a un codemandado de **toda** responsabilidad que pueda surgir en relación con el evento dañoso. Esta actuación se entiende como una exoneración de la responsabilidad hacia la víctima (relación externa) así como hacia la relación entre codemandados (relación interna). Por consiguiente, cuando esto sucede, si el codemandado liberado aceptó su responsabilidad en el evento dañoso o cuando finalmente un tribunal haga dicha determinación de responsabilidad, el principal efecto es que **la víctima asume la porción de responsabilidad que se le atribuya al co-causante liberado.**[14] Así pues, los demás co-causantes del daño no podrán recobrar ninguna cantidad del co-causante liberado.[15] No está disponible la acción de nivelación porque el acuerdo de transacción exoneró al co-causante

---

[13] Íd.; <u>Merle v. West Bend Co.</u>, 97 D.P.R. 403, 409 (1969); <u>S.L.G. Szendrey v. Hospicare Inc.</u>, *supra*, pág. 655; <u>Blás Toledo v. Hospital Nuestra Señora de la Guadalupe, et al.</u>, *supra*.

[14] <u>US Fire Insurance v. A.E.E.</u>, *supra*; <u>Szendrey v. Hospicare Inc.</u>, *supra*, pág. 656-659 (Énfasis suplido.)

[15] <u>US Fire Insurance v. A.E.E.</u>, *supra*.

relevado de la responsabilidad interna. Por consiguiente, se le resta la porción de responsabilidad que se le atribuya al co-causante liberado para que así éstos no paguen más de lo que le corresponda.[16]

En estas circunstancias, los demás co-causantes sólo responderán por la porción que quede luego de restar el monto correspondiente a la **porción de responsabilidad** del co-causante liberado y no por la totalidad de los daños.[17] Por su parte, el demandante recibirá la cantidad establecida en el acuerdo de transacción como pago del monto correspondiente a la porción de responsabilidad que en su día se determine para ese co-causante, si alguna.[18]

Por tal razón, conforme al riesgo asumido, si al dictar la sentencia el monto correspondiente a la porción de responsabilidad del co-causante liberado es mayor a lo recibido a cambio del relevo de responsabilidad, el demandante asume dicha reducción; por el contrario, si dicha cantidad es menor a lo recibido a cambio del relevo de responsabilidad, el demandante percibe la ganancia.[19]

En este tipo de acuerdo transaccional, si luego de haber sido liberado, dicho co-causante no es encontrado

---

[16] Este proceder se sostiene en el interés de evitar el enriquecimiento injusto de una parte, finalidad de la acción de nivelación. Íd.; Szendrey v. Hospicare Inc., *supra*, pág. 654; P.R. Fuels, Inc. v. Empire Gas Co., Inc., 149 D.P.R. 691, 712-713 (1999); Ramos v. Caparra Dairy, Inc., 116 D.P.R. 60, 63-64 (1985).

[17] US Fire Insurance v. A.E.E., *supra*; Szendrey v. Hospicare Inc., *supra*, pág. 658. (Énfasis suplido.)

[18] US Fire Insurance v. A.E.E., *supra*.

[19] Íd.

incurso en responsabilidad, éste no tiene derecho a recobrar lo pagado ni los demás co-causantes a instar una acción en nivelación. El demandante en este caso percibe la ganancia.

Por otra parte, el acuerdo transaccional se puede limitar a la exoneración de un co-causante en la relación externa solamente. Es decir, que el demandante renuncie a una acción de daños y perjuicios en contra de uno de los co-causantes, sin relevar a éste de los efectos que pueda tener con los restantes co-causantes. Este tipo de transacción no impide que la víctima continúe la demanda en contra de los demás co-causantes de su daño, esperando recobrar de éstos hasta la totalidad del monto correspondiente a los daños causados.[20] En el caso que para satisfacer la sentencia que advenga en su día, los demás co-causantes tengan que asumir la correspondiente porción del co-causante liberado y pagar una suma en exceso a la porción de responsabilidad que les corresponda, éstos tendrán disponible la correspondiente acción de nivelación.[21]

En este contexto, procede la reducción del monto de la sentencia **la cantidad** objeto de la transacción. De lo contrario, el demandante, sin asumir riesgo alguno, podría recobrar la totalidad del monto de la sentencia, así como

---

[20] US Fire Insurance v. A.E.E., *supra*; *Véase*, Blás Toledo v. Hospital Nuestra Señora de la Guadalupe, et al., *supra*.

[21] Íd.

la cuantía obtenida mediante el acuerdo transaccional.[22] Esta actuación constituiría un escenario de enriquecimiento injusto ya que los co-causantes percibirían un empobrecimiento al pagar más de lo que les corresponde y el demandante experimentaría un enriquecimiento, sin, como señalamos, haber asumido riesgo alguno. Por consiguiente, este tipo de acuerdo transaccional que exonera sólo de la relación externa a los co-causantes liberados, tiene el efecto de mantener la acción de nivelación disponible para los co-causantes no liberados hacia los liberados.

## C.

Con relación a los hechos del caso de autos, en el Acuerdo Privado de Transacción que suscribieron los demandantes con los doctores Comas, Figueroa Longo y Catasús, estos últimos se obligaron a pagar doscientos mil dólares ($200,000.00) como compensación total por todo lo que alegaba la parte demandante en cuanto a éstos. Aún así, los codemandados liberados expresaron que el pago de dicha suma de dinero no constituía una admisión de responsabilidad. Como resultado del Acuerdo, los demandantes relevaron a los doctores Comas, Figueroa Longo y Catasús de todas las reclamaciones expuestas en la demanda. Con esta actuación, se les exoneró de la relación externa entre éstos y los demandantes.

---

[22] US Fire Insurance v. A.E.E., *supra.*

Por otro lado, el Acuerdo refleja que la intención de los demandantes fue relevar a los codemandados de la relación interna por igual. Dicho contrato de transacción refleja que los demandantes le extendieron un relevo total a los codemandados transigentes en lo que respecta a cualquier reclamo de los demás codemandados de instarse una acción de coparte.[23] Por consiguiente, el Acuerdo exoneró a los codemandados liberados tanto de la responsabilidad externa como de la interna.

En el momento en el que los demandantes liberaron a los codemandados –los doctores Comas, Figueroa Longo y Catasús– de ambas relaciones, éstos se subrogaron  en sus posiciones. Al así hacerlo, el principal efecto fue que, si se le adjudicaba responsabilidad a algunos de los codemandados liberados, **se le restaría a la suma concedida la porción de responsabilidad adjudicada**. En este caso, los codemandados liberados no fueron encontrados responsables o co-causantes del acto torticero y, por lo tanto, nada se les podía restar a los demandantes de la

---

[23] En lo pertinente dicho acuerdo expone en la página 5 lo siguiente:

En la eventualidad de que el tribunal permitiera cualquier acción de coparte o de demanda de terceros contra alguno o todos los codemandados aquí comparecientes y en su día pudiera resultar que el Tribunal declarara con lugar cualquier acción de coparte o de demanda de terceros y que ello conlleve la imposición del pago de cualquier cantidad a favor del demandante de coparte o del demandante de tercero o de los demandantes; entonces los demandantes relevarán del pago de la partida que correspondiere, fuere la cantidad que fuere, a los aquí comparecientes…

Esto significa que los codemandados comparecientes no tendrán que pagar a la parte demandante suma adicional a la pagada a tenor con el presente acuerdo. La parte demandante a su vez renuncia a cualquier derecho que pueda tener a base de solidaridad para cobrarle a los demandados que aquí comparecen cualquier suma en exceso de la aquí acordada.

cantidad que recibieron como parte del contrato de transacción que suscribieron.

En US Fire Insurance v. A.E.E., *supra*, sostuvimos "que un demandante que suscribe un acuerdo transaccional con uno de los co-demandados y termina recibiendo en total una cantidad mayor a lo que le corresponde según la sentencia dictada a su favor, podrá percibir dicha ganancia dependiendo de lo pactado en el acuerdo transaccional". El acuerdo transaccional del presente caso demuestra que los demandantes asumieron la porción de responsabilidad que se le llegara a imputar a los codemandados liberados, por lo que asumió el riesgo de recobrar menos o más. La transacción en este tipo de casos conlleva la asunción de riesgos por parte de los demandantes y los codemandados liberados. Porque, como hemos mencionado, el contrato de transacción se fundamenta en la incertidumbre del litigio. Podría darse el caso donde se encuentre responsable al codemandado liberado, y dependiendo de su respectiva porción de responsabilidad, el negocio haya sido beneficioso o no para uno o el otro. Ese es el riesgo de la transacción.

En este caso, los doctores Comas, Figueroa Longo y Catasús llegaron a un acuerdo transaccional con los demandantes y de esta forma evitaron el largo proceso del litigio. Éstos asumieron el riesgo de pagar de más; lo que eventualmente sucedió. El Tribunal de Apelaciones en su sentencia descontó los doscientos mil dólares

($200,000.00) de la suma total de daños concedida bajo el palio de la equidad. Sostuvo que "[d]e no deducirse dicha cuantía del monto total otorgado por el foro sentenciador constituiría una doble compensación a favor de la parte demandante respecto a la suma estipulada".

Sin embargo, entendemos que con la normativa antecedida podemos disponer de la controversia sin tener que acudir a la equidad. Además, el posible efecto de cobrar de más por causa del riesgo asumido en un contrato de transacción no constituye una doble compensación por el daño sufrido.

Por otro lado, sostener la decisión del foro apelativo sería beneficiar a los codemandados que no aportaron nada en la consecución del acuerdo transaccional. Ellos pagarían menos de lo que le corresponde gracias a un contrato de transacción del cual no formaron parte, y por el cual no asumieron riesgo alguno. Además, permitir que el demandante perciba la ganancia en nada perjudica ni concierne a los codemandados puesto que éstos nada tuvieron que aportar a tal rédito, y por otro lado, ellos tienen que pagar el por ciento de responsabilidad que le corresponde de todos modos.

Por ende, revocamos en lo pertinente la determinación del Tribunal de Apelaciones y sostenemos que la cantidad de doscientos mil dólares ($200,000.00) concedida por el contrato de transacción no debió ser restada de la cuantía total de daños.

**III.**

En el planteamiento del segundo error, los demandantes alegan que el Tribunal de Apelaciones erró al determinar que el Hospital no es responsable por no contar para el 1993 con un protocolo para el traslado de infantes en condición crítica a una unidad terciaria. No les asiste la razón.

Entre los elementos requeridos por el Art. 1802 del Código Civil,[24] se encuentra la causalidad o relación causal. Ésta, no se establece a base de una mera especulación o conjetura, más bien en los casos de impericia médica, la causalidad se demuestra al probar que la actuación del médico fue la que con mayor probabilidad causó el daño.[25]

En los hechos particulares de este caso no está en controversia la responsabilidad del Hospital por la negligencia de sus empleados, que junto a la responsabilidad del Dr. Eliza y la falta del personal diestro en la Sala de Parto, fueron la causa que con mayor probabilidad causó el daño. Sin embargo, de conformidad con la prueba desfilada quedó establecido que aunque Miguel Alfonso se encontraba en una condición delicada, éste se mantuvo estable en Ponce e incluso no fue intubado hasta el siguiente día. Además, no surge del expediente ninguna evidencia que demuestre que el traslado fue

---

[24] 31 L.P.R.A. sec. 5141

[25] Rodríguez Crespo v. Hernández, 121 D.P.R. 639, 649-650 (1988).

negligente ni que la ausencia del protocolo afectara a Miguel Alfonso. Por tal razón, como atinadamente concluyó el foro apelativo, los demandantes no lograron demostrar la relación causal entre la falta del protocolo para el traslado de infantes en condición crítica a una unidad terciaria y los daños acaecidos.

**IV.**

Los demandantes alegan que el Tribunal de Apelaciones erró al reducir la compensación que les fue concedida por los daños físicos experimentados por su hijo. Tienen razón.

**A.**

El Artículo 1802 del Código Civil, *supra*, es el umbral de la responsabilidad civil extracontractual al exponer que "[e]l que por acción u omisión cause daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado". La doctrina ha definido el daño como "todo menoscabo material o moral causado contraviniendo una norma jurídica, que sufre una persona y del cual haya de responder otra".[26]

Intrínseco al mismo concepto del daño se encuentran los daños patrimoniales y los no patrimoniales. El daño patrimonial consiste en el menoscabo –valorable en dinero–

---

[26] J. Santos Briz, Tratado de Derecho Civil, Barcelona, Ed. Bosch, 2003, T. III, pág. 457; *Véase*, Ramírez Ferrer v. Conagra Foods Puerto Rico Inc., res. el 14 de abril de 2009, 2009 T.S.P.R. 55, 175 D.P.R. __; García Pagán v. Shiley Caribbean, 122 D.P.R. 193, 205-206 (1988).

sobre el patrimonio del perjudicado.[27] Por su parte los daños no patrimoniales "son en principio aquellos cuya valoración en dinero no tiene la base equivalencial que caracteriza a los patrimoniales, por afectar precisamente a elementos o intereses de difícil valoración pecuniaria".[28]

Los daños morales, en esencia, son daños no patrimoniales. Sin embargo, la doctrina ha distinguido entre los daños propiamente morales o puros y los daños morales impropios o daños patrimoniales indirectos. Los primeros son los que no producen repercusiones de carácter patrimonial; los segundos son aquellos que por medio de la "lesión de intereses inmateriales trascienden a valores del patrimonio".[29]

Hemos señalado anteriormente que los daños morales son los infligidos a las creencias, los sentimientos, la dignidad, la estima social o la salud física o psíquica del perjudicado.[30] Por consiguiente, son aquellos que afectan principalmente los derechos de la personalidad, ya sea física o moral, del ser humano.[31] Así también, se han

---

[27] H.M. Brau del Toro, Los Daños y Perjuicios Extracontractuales en Puerto Rico, San Juan, Publicaciones JTS, 1986, 2da ed., Vol. I, pág. 428; Santos Briz, op cit., pág. 461.

[28] Santos Briz, op cit., pág. 460.

[29] Santos Briz, op. cit., pág. 461; J. Castán Tobeñas, Derecho Civil Español, Común y Foral, Madrid, Ed. Reus, 1993, 15ta ed., Tomo 4, págs. 950-951.

[30] Rivera Colón v. S.L.G. Díaz, 165 D.P.R. 408, 428 (2005).

[31] Brau del Toro, op cit., pág. 427.

reconocido como daños morales **afecciones a la integridad de las facultades físicas, la privación de algún miembro o facultad de una persona**, así como todo dolor físico o moral.[32]

Ahora bien, el daño moral es un concepto amplio que abarca distintas vertientes de la naturaleza humana y surge de múltiples causas.[33] Como hemos señalado, dicha amplitud abarca desde el dolor físico o corporal, las angustias mentales, hasta los daños o lesiones corporales. Si bien en muchas ocasiones se han utilizado los términos de sufrimientos o daños físicos como conceptos independientes al concepto de "daño moral", es meritorio reconocer que éstos forman parte de dicho concepto aunque sea en vertientes diferentes.

Un acto torticero puede producir una lesión o daño corporal, el cual puede consistir desde golpes leves hasta un daño grave que produzca la muerte.[34] Este tipo de daño corporal es resarcible y ha sido reconocido como uno

---

[32] A. Borrell Macía, <u>Responsabilidades Derivadas de Culpa Extracontractual Civil</u>, Barcelona, Ed. Bosch, 1958, 2da ed., pág. 211. (Énfasis suplido.)

[33] "[A]sí, por ejemplo, el dolor moral que produce la pérdida de una joya familiar; de daños morales derivados de dolores físicos o de enfermedades físicas o mentales, y de daños morales concomitantes con daños patrimoniales o a la inversa. Todos ellos tienen de común producir perturbaciones anímicas (disgusto, desánimo, desesperación, pérdida de la satisfacción de vivir, etcétera), pero derivan de motivos distintos." Santos Briz, <u>op. cit</u>. Pág. 461.

[34] "El daño físico o corporal puede ser de naturaleza grave, que produzca la muerte. Incluye desde los golpes leves, laceraciones o abrasiones hasta fracturas, amputaciones de miembros, mutilaciones y daños a las estructuras óseas y a los órganos internos." A. J. Amadeo-Murga, <u>El valor de los daños en la responsabilidad civil</u>, San Juan, Ed. Esmaco, 1997, T. I, pág. 223.

independiente dentro del daño moral.[35] **Por consiguiente, una lesión a la integridad física de una persona o a sus facultades producto de un acto torticero puede ser compensable.**

Por otro lado, una de las principales manifestaciones de una lesión corporal puede ser el dolor. Manifestación que podría producirse tanto en el ámbito físico como psíquico de la persona. El dolor físico "[e]s la manifestación a nivel local o general de la lesión, como consecuencia de los receptores nerviosos especializados en las distintas captaciones de estímulos."[36] Es una sensación aflictiva por causa de una afección corporal, que se manifiesta de diversas formas, en la mayoría de los casos de forma perceptible. Por tal razón, para sentir dolor una persona tiene que tener la capacidad de sentirlos. Así pues, más allá del difícil proceso de cuantificar el dolor, es evidente que el dolor físico es más fácil de constatar, por estar relacionado intrínsecamente con la lesión corporal, que el dolor psíquico o las angustias mentales.[37]

Por su parte, la angustia mental es la reacción de la mente y de la consciencia en torno a un daño corporal o un

---

[35] Font v. Viking Construction, Corp., 58 D.P.R. 689, 711 (1941).

[36] B. Pérez Pineda, M. García Blázquez, Manual de Valoración y Baremación del Daño Corporal, Ed. Comares, 1995, 4ta ed., pág. 36.

[37] "El hombre, a diferencia del resto de los seres vivos, tiene capacidad para sentir el dolor en presente (manifestación puntual de la lesión), en pasado (recuerdo del dolor y la lesión sufrida), y en futuro (miedo a que se repita la situación dolorosa)." Íd., págs. 3-4.

evento sufrido y su impacto subjetivo en el bienestar personal.[38] Por consiguiente, la angustia mental no siempre guarda relación con un daño corporal, ya que afecta principalmente el ámbito emocional y mental del ser humano. Ésta puede surgir como consecuencia directa del evento dañoso o por su efecto colateral producto del daño que sufrió otra persona.

**B.**

Este Tribunal adoptó hace mucho tiempo que los sufrimientos físicos y mentales que sufre una víctima de un hecho torticero desde la ocurrencia de éste hasta su muerte son compensables a la víctima, por ende, al morir ésta, transmite la causa de acción a sus herederos.[39] Sin embargo, en torno a los niños recién nacidos, este Tribunal expresó que durante los primeros meses de infancia una niña no podía, como tal, sufrir daños mentales dentro del significado jurídico-compensatorio.[40]

---

[38] Amadeo-Murga, op cit., pág. 224.

[39] *Véase*, Vda. Delgado v. Boston Insurance, 101 D.P.R. 598 (1973). Además, este Tribunal se ha expresado en varias ocasiones al respecto. En Vda. Delgado v. Boston Insurance, *supra*, concedimos quince mil dólares ($15,000.00) a los herederos de un causante por los sufrimientos físicos y morales que sufrió por tres días previos a su muerte, a causa de extensas quemaduras. Por su parte, en la decisión de Publio Díaz v. E.L.A., 106 D.P.R. 854 (1978), concedimos cinco mil dólares ($5,000.00) por los sufrimientos que enfrentaron unos esposos durante un corto periodo de tiempo antes que perecieran ahogados en las corrientes de un río. En Colón v. Municipio de Guayama, 114 D.P.R. 193 (1983), este Tribunal elevó de quince mil dólares ($15,000.00) a veinticinco mil dólares ($25,000.00) la compensación concedida a los herederos de un joven que sufrió severas y dolorosas lesiones, que lo mantuvieron diez (10) días parapléjico antes de su muerte. En definitiva, es norma reiterada en nuestra jurisdicción que la causa de acción por daños morales es transmisible.

[40] Riley v. Rodríguez, 119 D.P.R. 762, 804 (1987).

Así pues, en casos de niños de pocos meses de nacidos que mueran a raíz de un hecho torticero, éstos sí transmiten su causa de acción sobre sus daños morales aunque limitada en lo correspondiente a la vertiente de los daños mentales.

### C.

Corresponde al juzgador, en su sano juicio, experiencia y discreción, la valoración justa y necesaria para compensar los daños y perjuicios sufridos.[41] Sin embargo, la razonabilidad debe ser la brújula que guíe al juzgador en el serpentino camino de la estimación y valoración de los daños. Así, en S.L.G. Rodríguez v. Nationwide, 156 D.P.R. 614, 622 (2002), expresamos lo siguiente:

> La estimación y valorización de daños es una gestión o tarea difícil y angustiosa, ello debido al cierto grado de especulación en la determinación de éstos y por incluir, a su vez, elementos subjetivos tales como la discreción y el sentido de justicia y conciencia humana del juzgador de los hechos.[42]

La labor judicial se torna más complicada en los casos de daños morales, ya que la determinación de un daño moral y su eventual compensación no es una labor mecánica ni realizable con facilidad. Por tal razón, conlleva un gran esfuerzo para tratar de conceder valor monetario a

---

[41] S.L.G. Rodríguez v. Nationwide, 156 D.P.R. 614, 623 (2002); Concepción Guzmán v. A.F.F., 92 D.P.R. 488, 502 (1965).

[42] Véanse, Nieves Cruz v. U.P.R., 151 D.P.R. 150 (2000); Rodríguez Cancel v. A.E.E., 116 D.P.R. 443, 451 (1985).

intereses personales que no son parte del entramado patrimonial.

Por ende, este Tribunal ha sostenido en innumerables ocasiones que se abstendrá de intervenir con la apreciación de la prueba y la determinación de daños que un foro de instancia haya emitido.[43] Así pues, es norma clara que en deferencia y respeto a los foros de instancia, y en pro de la estabilidad, los tribunales apelativos solamente tienen la facultad de modificar las cuantías concedidas en aquellos casos en que las mismas "sean ridículamente bajas o exageradamente altas".[44]

### D.

El Tribunal de Primera Instancia concedió a los padres de Miguel Alfonso la cantidad de cincuenta mil dólares ($50,000.00) por los daños y sufrimientos físicos de éste. En específico dicho tribunal sentenció:

> El bebé Sagardía-Delíz en vez de ser recibido, por el calor de los brazos tiernos de sus padres, fue colocado en una cuna con un respirador y todo su pequeño cuerpecito tenía tubos y agujas que le fueron colocados para medicarlo y alimentarlo por los 25 días en que vivió. Ese sufrimiento físico es compensable y le otorgamos por ello una cantidad razonable a los padres en la acción heredada de su hijo por dicho concepto.

Sin embargo, al final de la sentencia, la juez de instancia expuso que los cincuenta mil dólares ($50,000.00) a ambos demandantes por la causa heredada de su hijo era

---

[43] Albino Agosto v. Martinez, Inc., res. el 4 de junio de 2007, 2007 T.S.P.R. 111, 171 D.P.R. ___; S.L.G. Rodríguez v. Nationwide, *supra*.

[44] Íd.

por el dolor físico sufrido por éste, a razón de dos mil dólares ($2,000.00) por día por veinticinco (25) días. Así pues, el Tribunal de Apelaciones utilizó esta expresión para descontarle a la cuantía concedida los días que el bebé "no percibió dolor". Dicho tribunal restó un total de ocho (8) días de la cuantía otorgada fundamentado en que el niño estuvo: un (1) día sin intubar, dos (2) días sedado sin respuesta a los estímulos y cinco (5) días en estado de coma.[45]

Si bien es cierto que el foro primario expresó al final de su sentencia que la cuantía concedida era a razón de dos mil dólares ($2,000.00) por día, lo cierto es que, según puede colegirse de la totalidad de la propia sentencia, la compensación de cincuenta mil dólares ($50,000.00) era por concepto de los **daños** y sufrimientos físicos de Miguel Alfonso. No sólo por los dolores físicos que sufrió, sino por el concepto más abarcador del daño moral, entre los cuales se encuentran las **lesiones corporales**.[46] Es evidente que el pequeño Miguel Alfonso

---

[45] El Tribunal de Apelaciones específicamente dijo:
    Del total concedido por el Tribunal de Primera Instancia deberán descontarse los días en que Miguel Alfonso no estuvo intubado y con tubos y agujas en todo su cuerpo, a saber el día 2. También, deberán descontarse los días en que según el récord médico del Hospital Damas el bebé estuvo sedado y no respondía a estímulos, o sea, los días 3 y 4. De igual forma deberán deducirse los días en que el niño permaneció comatoso y sin respuesta a dolor, a saber los días 23, 24, 25, 26 y 27. Todos estos suman un total de ocho (8) días por lo que solo procedería dicha partida por diecisiete (17) días a razón de $2,000.00 diarios para un total de $34,000.00.

[46] Es necesario señalar, que no entendemos prudente la acción de valorar los daños a base de los días en los que una persona estuvo o no en un estado de inconsciencia o comatoso, tal como lo hizo el tribunal de instancia. Más bien, somos de la opinión que la mejor práctica sería que tal proceso pudiera utilizarse para calcular una

estuvo algunos días sedado y en estado de coma como consecuencia de una afección a su integridad corporal, producto de un acto de impericia médica. **Esta lesión corporal, así como su afección a su facultad de sentir, son compensables. El que una persona esté en estado de coma o sedada como consecuencia de un acto torticero, constituye una lesión corporal compensable como daño moral. Dicha compensación no se fundamenta en la percepción del dolor solamente sino, entre otras cosas, en la lesión que sufrió, la cual la mantiene en la condición comatosa o imperceptible al dolor.[47]**

Por ende, la cuantía concedida a los demandantes por los daños sufridos por su hijo corresponde a todos los daños morales que éste sufrió como consecuencia del acto torticero. Esa cuantía la entendemos razonable por lo que nos abstenemos de intervenir con la apreciación de la prueba y la determinación de daños que el foro de instancia hizo. En vista de lo anterior, revocamos la determinación del Tribunal de Apelaciones de reducir la cuantía concedida a los padres de Miguel Alfonso, por los daños que éste sufrió.

---

suma única y separada que indemnice el daño objetivo de perder contacto con la realidad, por determinado tiempo, o como parte del proceso para calcular la suma general de daños a concederse.

[47] Por otro lado, no surge del expediente ningún tipo de prueba pericial o científica que sostenga la conclusión de que el niño no sintió dolor los días que estuvo sin intubar y sin agujas por todo el cuerpo y los días en que estuvo sedado, como sostuvo el foro apelativo en su sentencia.

**V.**

Por último, los demandantes señalan como cuarto error que quedó demostrado que el grupo de anestesiólogos para el que trabajaba el Dr. Eliza tenían una responsabilidad contractual de tener el personal diestro disponible que fuera necesario en sala de parto en todo momento y por lo tanto, se debía imponer responsabilidad vicaria al Hospital por las actuaciones del Dr. Eliza. Sin embargo, al examinar la sentencia del Tribunal de Apelaciones es claro que dicho tribunal modificó la sentencia del Tribunal de Primera Instancia al exponer que la responsabilidad era del Hospital y no del grupo de anestesiólogos.[48] Así, como muy bien sentenció el foro intermedio, la responsabilidad del Hospital era directa y no vicaria. Nos corresponde entonces, determinar si el Hospital es vicariamente responsable por las actuaciones del Dr. Eliza.

**A.**

No existe duda de que un hospital responde por la negligencia de sus empleados al cometer actos de mala

---

[48] Específicamente el Tribunal de Apelaciones expuso en su sentencia lo siguiente:
   "Al analizar el contrato nos percatamos que el mismo es uno referido *únicamente* al servicio de anestesiología y *no de servicios total[es]* de las salas del HOSPITAL. La exclusividad del contrato no re[levó] en ningún momento de responsabilidad al HOSPITAL de proveer el personal adiestrado y equipo necesario para la operación de sus salas. Fue erróneo del Tribunal de Primera Instancia concluir que en virtud del contrato de exclusividad Eliza era la persona responsable de proveer el personal y equipo necesario en las Salas de Operaciones. Es nuestro análisis del contrato que era el hospital quien tenía la obligación de proveer personal y equipo necesario para ofrecer los servicios de anestesiología (a excepción de los anestesistas)." Págs. 47 y 48 (Énfasis en el original.)

práctica contra pacientes atendidos en sus facilidades. La responsabilidad del hospital, en estos casos, se enmarca en la responsabilidad vicaria bajo el palio del artículo 1803 del Código Civil.[49] Sin embargo, con relación a los actos de impericia médica cometidos exclusivamente por un médico no empleado de un hospital, al cual la institución le concedió el privilegio de utilizar sus facilidades para atender sus pacientes privados, este Tribunal ha establecido una clara distinción.

Si se trata de actos ocasionados por el médico hacia sus pacientes privados, cometidos en un hospital que el médico escogió, de ordinario el hospital no responde.[50] No obstante, el hospital podría responder por éstos médicos si incumple con alguna de las siguientes disposiciones: (a) una cuidadosa selección de los médicos a quienes les ha conferido el privilegio; (b) exigir que esos médicos se mantengan al día con cursos de mejoramiento profesional; (c) mantenerse al tanto del trabajo de esos médicos e intervenir, cuando sea posible, ante un acto obvio de impericia médica de éstos; (d) descontinuar el privilegio concedido ante repetidos o crasos actos de impericia médica de esos médicos; y (e) mantenerse razonablemente al día en cuanto a los adelantos tecnológicos habidos.[51]

---

[49] 31 L.P.R.A. sec. 5142

[50] Márquez Vega v. Martínez Rosado, 116 D.P.R. 397, 408-409 (1985).

[51] Íd., págs. 409-410.

Por su parte, en el escenario en el cual el paciente acude al hospital y es el hospital el que le provee los médicos, hemos pautado que el hospital responderá solidariamente con el médico no empleado, responsable del acto de impericia.[52] Esto es así, en primer término, porque es el hospital el que provee el servicio del médico en particular, y el paciente normalmente no tiene opción o participación alguna en su selección.[53] Por tal razón, "[h]asta cierto punto se puede afirmar que en esta clase de situación el hospital le está 'garantizando' al paciente que ese doctor, o cualquiera otro que lo atienda bajo esas circunstancias, es uno competente y apto para prestarle ayuda médica."[54] En segundo lugar, el paciente a quien tiene de frente es al hospital y no a los médicos en particular.[55] Así pues, el médico que labora en el hospital es, ante el paciente, un aparente empleado del hospital o un auxiliar del mismo. En tercer lugar, es evidente que cuando un paciente acude al hospital a recibir un servicio, la relación principal que se crea es entre éste y el paciente.[56] Ya que en este contexto, el hospital no es un lugar que alberga a muchos médicos individuales, sino que es un ente que se obliga a brindar un buen servicio al

---

[52] Márquez Vega v. Martínez Rosado, *supra*, pág. 407

[53] Íd.

[54] Íd.

[55] Íd.

[56] Íd., pág. 408

paciente que acude a éste. Por último, este Tribunal ha sostenido que incluso en casos que estemos ante un contratista independiente, pero en una relación en la que el hospital "resulta principalmente beneficiado por la labor que realiza el médico", éste deberá responder por los actos negligente de aquél.[57]

Además, respecto a la anterior normativa, reconocimos que "no hace diferencia alguna que el doctor que atienda al paciente sea o un empleado propiamente del hospital, **o uno a quien el hospital le haya concedido una 'franquicia' para brindar servicios médicos especializados a los pacientes del mismo**, o uno que es miembro de la facultad (staff) del hospital y a quien éste llama en consulta para atender al paciente, etc.".[58]

En torno a los escenarios de franquicias exclusivas –como contratos para servicios de radiología, anestesiología y servicios de salas de emergencias, entre otros– es evidente que le aplica la doctrina precedida. En este tipo de escenario usualmente el paciente no tiene participación u opción alguna en la selección del médico o servicio en particular. Es el hospital quien provee el servicio a aquellos pacientes que acuden a éste. Por consiguiente, en este tipo de situaciones, el hospital es responsable ante el paciente conjuntamente con el médico.

---

[57] Márquez Vega v. Martínez Rosado, *supra*, pág. 408

[58] Íd. (Énfasis suplido.)

Se crea una garantía implícita de que es el hospital quien va a proveer el servicio y de manera competente. Sin embargo, en este tipo de situación en la cual el hospital le concede una franquicia exclusiva a un médico o a un grupo de éstos para brindar servicios médicos especializados a los pacientes del propio hospital, la institución deberá responder por los actos negligentes de éstos.

Con relación a la situación particular de un concesionario de una franquicia exclusiva para prestar servicios de anestesiología en un hospital, ya este Tribunal había expresado que estos concesionarios responden junto con el hospital si éste carece de equipo básico para operar la concesión adecuadamente.[59] No obstante, es preciso añadir que aunque en muchos de éstos casos nos enfrentamos ante un contratista independiente, al hospital resultar principalmente beneficiado por la labor que realiza el médico, éste deberá responder junto con el médico por los actos negligentes que éste último cometa.[60]

Ahora bien, la responsabilidad del hospital no es una vicaria, sino una responsabilidad directa, primaria e independiente, dirigida hacia el paciente. Responsabilidad que no puede evadir empleando contratistas independientes

---

[59] Blás v. Hosp. Guadalupe, 146 D.P.R. 267, 323, 350 (1998).

[60] Márquez Vega v. Martínez Rosado, *supra*, pág. 408.

porque quien le está proveyendo el servicio y los médicos al paciente es el propio hospital. Por tal razón, ambos responderán solidariamente por el acto negligente cometido.

Anteriormente, habíamos reconocido que en ciertas circunstancias los hospitales podrían ser responsables por aquellos médicos que sólo gozan del privilegio de laborar en dicho hospital sin ser empleados del mismo.[61] En esa ocasión, adelantamos que en estos casos la responsabilidad sería solidaria, sin menoscabo de la determinación de los grados de responsabilidad y el derecho a la nivelación en la relación interna.[62] Por ende, si el paciente acudió al hospital, ya sea por su cuenta o por orden de su médico privado, y sufre algún daño compensable por causa de un médico contratista independiente, tanto el médico como el hospital responderán solidariamente.

**B.**

En lo referente a la responsabilidad del Hospital sobre las actuaciones del Dr. Eliza, surge expresamente de la cláusula trigésima del contrato de exclusividad que el segundo es un contratista independiente del primero. Sin embargo, como expresamos anteriormente, el Hospital responde solidariamente por las actuaciones de éste. En este caso la señora Deliz acude al Hospital por órdenes de

---

[61] Nuñez v. Cintrón, 115 D.P.R. 598, 606 (1984).

[62] Íd.

su médico, pero el acto de impericia médica no fue causado por dicho médico. El acto de impericia fue causado por el anestesiólogo Eliza, el cual es un contratista independiente del Hospital. No obstante, es evidente que la señora Deliz no tuvo opción ni participación alguna a la hora de escoger el médico que iba a anestesiarla, y mucho menos que tendría que ser ese anestesiólogo (Dr. Eliza) quien tendría que atender a su bebé, por falta de un pediatra en la sala de operaciones. Por su parte, al ser operada, el anestesiólogo pasó a ser un auxiliar del Hospital y así la institución está sujeta a responder solidariamente con el médico, por los actos de éste. Así pues, el cuarto error no fue cometido.

## VI.

Por los fundamentos antes expuestos, se modifica la sentencia dictada por el Tribunal de Apelaciones, a los efectos antes indicados, y así modificada, se confirma la misma.

Se dictará Sentencia de conformidad.

Erick V. Kolthoff Caraballo
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Miguel Sagardía De Jesús
et als.

    Peticionarios                CC-2005-1263      Certiorari

       v.

Hospital Auxilio Mutuo
y Otros

    Recurridos

SENTENCIA

San Juan, Puerto Rico, a 12 de noviembre de 2009.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se modifica la sentencia dictada por el Tribunal de Apelaciones, a los efectos antes indicados, y así modificada, se confirma la misma.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Fiol Matta y la Juez Asociada señora Rodríguez Rodríguez concurren con el resultado sin opinión escrita. El Juez Presidente señor Hernández Denton emitió Opinión concurrente en parte y disidente en parte.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Miguel Sagardía de Jesús,
*et al.*

    Peticionarios

       v.

Hospital Auxilio Mutuo               CC-2005-1263
    Certiorari
y otros

    Recurridos

Opinión concurrente en parte y disidente en parte emitida por el Juez Presidente SEÑOR HERNÁNDEZ DENTON

San Juan, Puerto Rico, a 12 de noviembre de 2009.

Concurrimos con la Parte IV de la Opinión del Tribunal, pues el foro recurrido erró al reducir la indemnización otorgada a los esposos Sagardía-Deliz por los daños que sufrió su hijo Miguel Alfonso. Ahora bien, disentimos del resto de la Opinión del Tribunal por entender que a la luz del contrato de transacción suscrito en el caso de autos procede que apliquemos la norma pautada en Szendrey v. Hospicare, Inc., 158 DPR 648, 658-59 (2003).

De esta forma, los demandantes absorberían la porción de la culpa que les hubiera correspondido a los demandados que liberaron, tanto en la relación externa como en la relación interna, y por ende, se reduciría de la suma concedida mediante sentencia

la cantidad correspondiente al grado de negligencia de esos codemandados. A falta de una determinación específica sobre la distribución de culpas en la relación interna, entonces procede devolver el caso al Tribunal de Primera Instancia para que realice la misma o divida equitativamente la culpa entre todos los cocausantes del daño. Véase Art. 1091 del Código Civil de Puerto Rico, 31 LPRA sec. 3102; véanse, además: U.S. Fire Insurance Co. v. AEE, 2008 TSPR 160, res. 24 de septiembre de 2008; Sánchez Rodríguez v. López Jiménez, 118 DPR 701, 710 y n.2 (1987).

En la Opinión del Tribunal, sin embargo, se resuelve que los efectos de la norma que pautamos en Szendrey no son aplicables a este caso, porque no se presentó reclamación alguna contra los médicos relevados. Además, se expresa que los codemandados restantes —el Dr. Miguel A. Eliza García (anestesiólogo) y el Hospital Auxilio Mutuo— no presentaron prueba sobre la responsabilidad de esos codemandados ni sobre la distribución de la culpa entre los cocausantes de la muerte de Miguel Alfonso. Por tanto, se resuelve que no procede descontar de la sentencia el monto correspondiente al grado de culpa de los demandados liberados.

El principal problema con esta determinación estriba en que Szendrey prohíbe, precisamente, presentar cualquier reclamación —ya sea a través de una demanda contra coparte, una demanda contra tercero o una demanda independiente de nivelación— en contra de los codemandados liberados, cuando la intención expresada en el contrato de transacción es eximirlos de su responsabilidad en la relación interna y

externa. No sería necesario reclamarle a los codemandados liberados, pues en virtud del contrato de transacción éstos en nada tendrían que responderles a los demandantes o a los demandados que permanezcan en el pleito.

No obstante, a cambio de ese relevo total, la parte demandante se coloca en la posición de los codemandados liberados. De esta manera, asume el riesgo de que en la determinación final de responsabilidad contra *todos* los cocausantes, se le impute a éstos un grado de culpa mayor al anticipado cuando se suscribió el acuerdo transaccional. Sólo de esta forma tendría sentido firmar un contrato de transacción pues, como es sabido, parte de la causa en este tipo de convenios es que se renuncie mutuamente a algo. A tales efectos, se ha expresado que:

> No es lícito afirmar que la causa se centre en el poner fin a una controversia, sino que debe complementarse necesariamente con las recíprocas concesiones… Es necesario siempre que ambas partes sacrifiquen y concedan al mismo tiempo alguna cosa en función de la superación del litigio sobre la cosa controvertida.
> …
> *En conjunto, el litigio y las recíprocas concesiones constituyen los elementos de la causa.* S. Tamayo Haya, El contrato de transacción, Madrid, Thomson-Civitas, 2003, pág. 210 (citado en López Tristani v. Maldonado, 168 DPR 838, 857 (2006)).

En vista de este principio, es inevitable cuestionar cuál es la verdadera causa del contrato de transacción que firmaron los demandantes en este caso. Si a pesar de firmar dicho acuerdo transaccional no enfrentarían riesgo alguno, pues como resuelve la Opinión del Tribunal pueden recobrar los daños que causaron *todos* los que intervinieron en su

producción, tal contrato carecería de causa. Más importante aún, permitir que los demandantes cobren tanto la cuantía obtenida mediante transacción, como la concedida mediante sentencia, sería improcedente. Esto, pues los demandados que no tomaron parte en el acuerdo transaccional estarían pagando el total de la sentencia y, en virtud de dicho contrato, no tendrían el derecho de presentar una acción de nivelación contra los demandados liberados.

En atención a ello, en Szendrey resolvimos en términos claros e imperativos que el foro de instancia "tendrá que determinar en su sentencia el monto líquido total de los daños ocasionados a la parte demandante por *todos* sus cocausantes y deducirá de dicho monto total aquella porción monetaria equivalente al grado de responsabilidad" del codemandado liberado. Del mismo modo, para la nivelación entre los codemandados que permanezcan en el caso, "tendrá que determinar el grado de contribución de cada uno de éstos a los daños sufridos por la parte demandante, aun cuando permanecen obligados frente a ésta por la totalidad de los daños restantes", o sea, por la suma que resulte tras el descuento de aquella porción que corresponda al grado de culpa del codemandado liberado. Íd. págs. 658-59.

La alternativa a lo anterior sería, claro está, que en una acción independiente de nivelación los demandados que no formaron parte del acuerdo transaccional —en este caso, el doctor Eliza García y el hospital— les reclamen a los demandantes por el monto que pagaron en exceso y que éstos debían asumir según el contrato de transacción. Véase Soc.

*de Gananciales v. Soc. de Gananciales*, 109 DPR 279 (1979);

*Torres v. AFF*, 94 DPR 314 (1967).

A pesar de ello, en vista de que los litigantes en esa acción futura de nivelación ya forman parte del caso ante nuestra consideración, es innecesario aguardar porque se presente tal demanda. No hay duda de que en este caso el foro de instancia erró al no aplicar la norma de *Szendrey* cuando dictó su sentencia. Durante el primer día del juicio se suscitó un extenso debate sobre el alcance del contrato de transacción, sus efectos sobre los demandados liberados y sus consecuencias en cuanto a las normas de solidaridad. Tras analizar el asunto, y a pesar de negarse inicialmente a acoger el acuerdo transaccional, el foro de instancia le impartió su aprobación. Ello luego de que los abogados de los demandantes le manifestaran al tribunal que habrían de presentar prueba sobre la responsabilidad de cada uno de los demandados –incluso de aquellos que fueron liberados en virtud del acuerdo transaccional. Véase *Addendum* a la Pet. de *Certiorari*, págs. 61-62. Así, pues, el foro de instancia podría adjudicar los grados de culpa correspondientes a cada uno de los cocausantes y, por lo tanto, podría aplicar correctamente la normativa de *Szendrey*.

Una lectura de dicho contrato de transacción revela que las partes en este caso tenían la intención de liberar al Dr. Arsenio Comas Urrutia y a su grupo de obstetricia, tanto en la relación externa como en la relación interna:

> [L]a parte demandante releva, exonera y para siempre libera a los codemandados Dr. Arsenio Comas Urrutia, Seguros Triple-S, Inc., y a la Sociedad profesional

para la práctica de Ginecología Obstetrics Gynecologist & Perinatal Medicine Associates, compuesta por el Dr. Arsenio Comas, el Dr. Juan Figueroa Longo, y el Dr. Ubaldo Catasús, de todas las reclamaciones o causas de acción que surjan por cualquier motivo o por razón de cualesquiera daños o pérdida … que la parte demandante haya sufrido o que de aquí en adelante pueda sufrir como consecuencia de los hechos de la demanda radicada en este caso o en cualquiera de sus enmiendas.

…

A la fecha en que se suscribe el presente Acuerdo no existen acciones de coparte entre los codemandados. En la eventualidad de que después de firmarse y ejecutarse el presente acuerdo alguno de los codemandados que permanecen en el pleito procedieran a radicar alguna acción de coparte o de demanda de terceros contra todos o algunos de los codemandados aquí comparecientes, aunque cualquiera de dichas acciones sería tardía e improcedente en derecho, los demandantes se obligan previo pago de la suma transaccional de $200,000.00 a lo siguiente:

a. Le extienden un relevo total a los codemandados comparecientes en lo que respecta a cualquier reclamo de los codemandados en dicha acción de coparte.

b. [De permitirse cualquier demanda contra coparte o contra tercero,] los demandantes relevarán del pago de la partida que correspondiere, fuere la cantidad que fuere, a los [codemandados] aquí comparecientes.

En atención al lenguaje del citado contrato, y como parte de la evaluación de éste, el foro de instancia indicó al comenzar la vista en su fondo que "los abogados de la parte demandante… van a probar todas sus alegaciones… en contra de partes que ni siquiera ya van a estar aquí". *Addendum* a la Pet. de *Certiorari*, págs. 61–62. Ello en obvia referencia al doctor Comas y a los otros demandados liberados. Así, pues, no le correspondía a los codemandados que quedaron en el pleito presentar prueba contra aquellos que fueron liberados, ya que ante un acuerdo transaccional como el que se firmó en este caso, cualquier demanda contra

coparte o contra tercero hubiese sido improcedente. Tampoco es pertinente que el doctor Eliza "renunciara" a reclamar cantidad alguna de parte de los codemandados liberados, ya que de todos modos no lo podía hacer en virtud del contrato de transacción.

Aun cuando en los primeros días del juicio se presentó cierta prueba relacionada con las actuaciones del doctor Comas, los demandantes reevaluaron su determinación previa de pasar prueba en contra de éste y anunciaron que estarían retirando al perito obstetra que habían contratado a tales efectos. Ello por entender que no era necesario ante el contrato de transacción suscrito por las partes. Ap. de la Pet. de *Certiorari*, págs. 1164-65. Sin embargo, a esa fecha ya habíamos resuelto Szendrey v. Hospicare, Inc., *supra,* mediante Opinión emitida el 14 de febrero de 2003.

En vista de ello, somos del criterio que antes de dictar su sentencia —en diciembre de 2003— el foro de instancia debió requerir prueba sobre el grado de culpa correspondiente a los demandados liberados, en virtud de la norma de Szendrey. Los demandados así se lo hicieron saber al tribunal en diversas ocasiones, incluso mediante la presentación de una moción de determinaciones de hecho y conclusiones de derecho adicionales. Aun así, el Tribunal de Primera Instancia denegó dicha moción bajo el fundamento de que el acuerdo transaccional era confidencial. Ap. de Pet. de *Certiorari*, págs. 164-68. Erró al así proceder.

Por ende, concurrimos con la Parte IV de la Opinión del Tribunal que revoca la reducción de la suma concedida a

los esposos Sagardía-Deliz por los daños que sufrió su hijo Miguel Alfonso. Ahora bien, disentimos de su negativa de aplicar la normativa establecida por este Tribunal en Szendrey v. Hospicare, Inc., *supra*, al caso de autos.


                                    Federico Hernández Denton
                                         Juez Presidente